10288

HYDE *ET AL.* v. LOGAN *ET AL.*
BOYKIN *ET AL.* v. SAME.

(101 S. E. 41.)

1. ELECTIONS—PRIMARY ELECTION CONTEST; JURISDICTION OF COURT TO REVIEW.—Court has jurisdiction to review the action of the Democratic executive committee of a city in ascertaining and declaring result of primary election for candidates for mayor and aldermen; there being no inference to the contrary to be drawn from Act February 20, 1915 (29 St. at Large, p. 163), adding section 282k to Civ. Code 1912, making action of State committee in reviewing action of county committee final, for such statute, even as to action of State committee, makes its decision final only so far as the councils of the party are concerned.

2. ELECTIONS—PRIMARY ELECTION CONTEST; DISQUALIFICATION OF MEMBERS OF EXECUTIVE COMMITTEE.—Members of party executive committee, hearing primary election contest, who were candidates at the election, were disqualified from acting with the committee in deciding questions presented by the contest.

3. ELECTIONS—HARMLESS ERROR AND IRREGULARITIES; PRESUMPTIONS FAVORING VALIDITY.—Errors which do not appear to have affected the result will not be allowed to overturn an election, and every reasonable presumption will be indulged to sustain it.

4. ELECTIONS—PRIMARY ELECTIONS; HARMLESS ERROR.—In *certiorari* to contest primary election, where, if all votes contested had been given to petitioners for *certiorari*, their opponents would still have had a majority, it was apparent that petitioners had suffered no injury from any irregularities.

5. ELECTIONS—PRIMARY ELECTIONS; BURDEN OF PROVING ERROR IN COUNT.—Where petitioners for *certiorari*, to review action of party executive committee in ascertaining and declaring result of primary election, alleged error on the part of the committee in refusing their petition for a recount, it was not enough for petitioners to make it appear there were possible errors in the count, but they should have made out at least a probable case.

6. ELETCIONS—PRIMARY ELECTION CONTEST; OBJECTIONS NOT RAISED BELOW.—Disqualification of executive committee members from acting with the committee in hearing primary election contest cannot avail petitioners on *certiorari* to review proceedings of committee, where disqualification was not objected to at time of hearing.

7. JUDGES—EFFECT OF DISQUALIFICATION.—The action of a disqualified Judge is not void, but voidable only.

8. ELECTIONS—PRIMARY ELECTION CONTEST; DISQUALIFICATION OF MEMBERS OF EXECUTIVE COMMITTEE.—Members of executive committee were not disqualified from hearing primary election contest by reason of being law partners of one of the candidates.

9. ELECTIONS—PRIMARY ELECTION CONTEST; SEPARATION OF WITNESSES.—Separation of witnesses at primary election contest hearing before executive committee was discretionary with the committee, and where contest engendered bitter feeling the committee did not commit error by separating the witnesses.

10. ELECTIONS—PRIMARY ELECTION CONTEST; RIGHTS OF VOTER.—The right to vote is a substantial right protected by law, and a voter whose right has been challenged should be allowed to hear the evidence against his right, in order that he may have opportunity to adduce evidence in rebuttal or in support of his right.

11. TRIAL—EXCLUSION OF WITNESSES—The discretion to exclude witnesses rarely, if ever, extends to the exclusion of the parties to a cause.

12. ELECTIONS—PRIMARY ELECTION CONTEST; RIGHT OF EXECUTIVE COMMITTEE TO DELEGATE POWER TO DETERMINE.—Power to hear and determine primary election contest, given executive committee, being judicial, cannot be delegated to a subcommittee.

13. ELECTIONS—PRIMARY ELECTION CONTEST; EXECUTIVE COMMITTEE'S RIGHT TO INTERPRET RULES.—The executive committee's right to interpret rules made by them as to primary election contests did not give it the right to give rules a meaning of which their language is not susceptible.

14. ELECTIONS—PRIMARY ELECTION CONTEST; AMENDMENT OF RULES BY EXECUTIVE COMMITTEE.—Power given executive committee to make rules as to primary election contests did not give committee the right to amend them at any time.

15. ELECTIONS—PRIMARY ELECTION CONTEST; RULES OF EXECUTIVE COMMITTEE.—Under statutes regulating primary elections, the executive committee had no right to amend rules after the primary and make amendments applicable to election already held.

16. ELECTIONS—PRIMARY ELECTION CONTEST; DELEGATION OF HEARING OF TESTIMONY TO SUBCOMMITTEE PREJUDICIAL ERROR.—The action of the executive committee hearing primary election contest in referring the matter of challenged votes to a subcommittee *held,* on *certiorari,* prejudicial error, where in one case the committee failed to adopt the only reasonable inference, and where in a number of cases the evidence was susceptible of an inference contrary to that drawn by the committee.

17. ELECTIONS—PRIMARY ELECTION CONTEST; EXECUTIVE COMMITTEE'S REFUSAL TO CONSIDER MUTILATED BALLOTS.—Where inclusion of alleged mutilated ballots might change the result of a primary election, and where evidence was conflicting as to whether ballots were so scratched as to destroy their secrecy and as to a candidate for which they were cast, refusal of executive committee, hearing election contest, to consider such ballots, held error.

18. ELECTIONS—DECISION OF ELECTION MANAGERS AS TO MUTILATION OF PRIMARY BALLOTS.—Decision of managers of election as to mutilation of primary ballots is not conclusive.

19. ELECTIONS—SECRECY OF PRIMARY BALLOT NOT DESTROYED BY MARKS SCRATCHED THROUGH BALLOTS.—The fact that a ballot was scratched, either with pencil or pen, so that the marks show through on the opposite side, does not necessarily warrant the inference that the secrecy thereof was destroyed, because it may have been folded so that no one could tell, without unfolding it, whose names had been scratched.

20. ELECTIONS—PRIMARY ELECTION CONTEST; DISPOSITION ON CERTIORARI. —On *certiorari* to review action of executive committee in hearing primary election contest, where error appears, but Court cannot determine from the record which of the candidates received the majority of votes that were or ought to have been counted, it will not declare the result, and will merely set aside the action of the committee.

IN THE ORIGINAL JURISDICTION. *Certiorari* by Tristram T. Hyde and others and by John I. Boykin and others to review action of W. Turner Logan and others, Democratic Executive Committee. Action of committee set aside.

*Messrs. Alfred Huger, Walter B. Wilbur* and *L. D. Jennings,* for petitioners, submit: *The Court has power to act*

*in this case:* 54 S. C. 478; 93 S. C. 327; 70 S. C. 263; 86 S. C. 451; 2 Rich. 6. *Nature and purpose of the primary:* 59 L. R. A. 447. *Messrs. Bold and Michel were disqualified by interest from serving as members of the executive committee:* 121 Cal. 102; 66 A. S. R. 22; 102 Maine 447; 67 Atl. 564; 120 Am. S. R. 512; 3 H. L. Cas. 759, 793; 62b 756; 23 Ala. 85; 121 Cal. 102; 53 Pac. 434; 11 L. R. A. 762; 60 Kan. 446; 56 Pac. 755; 13 Mass. 324; Cooley's Constitutional Limitations 592, 595; 1 S. C. 30; 97 S. C. 15; Acts 1915, vol. XXIX, Stats. of South Carolina, sec. 282; 74 N. H. 450; 69 Atl. 777; 124 A. S. R. 983; 3 N. Y. 547; 189 Pa. 348; 41 Atl. 994; 58 N. H. 197. *The committee on canvass had no inherent power to hear and determine the challenges:* 15 Cyc. 380; R. C. L. 1110; 18 Cent. Dig. (Elections Col. 385) *Id.,* Col. 387; 7 S. C. 241; 86 S. C. 458; 1 S. C. 30; Code of 1912, vol. I, sections 243 and 254; 3 Brev. 491. *It was duty of the executive committee as a whole to hear and determine the protests, contests, and challenged votes:* Rules IX, XXV and XXIII of the party; 118 Ind. 350; 10 A. S. R. 145; 54 S. C. 1; 71 N. H. 456; 69 Atl. 777; 124 American St. Reports 983; Q. B. 190; Cyc., vol. XXIII, p. 1620; 3 Brev. 491; sec. 282 of the Code; sec. 17, Acts of 1915, p. 165; 99 Pac. 890; 53 Oregon 552; 11 Atl. 151; 36 R. I. 331; 8 Atl. 1066; Ann. Cases 1916c, 1257; 47 L. R. A. 569; 65 Ill. 525 (footnote); 244 Ill. 363; 91 N. E. 475; 135 A. S. R. 342, 349, and cases therein cited; 110 Ind. 350; 10 A. S. R. 143; 6 R. C. L. 172; 15 R. C. L. 511; 2 Brev. 264, and cases cited therein; 7 S. C. 241; 3 Brev. 491. *The Court can sustain the election as declared by the managers:* 265 Ill. 39; 106 N. E. 504; Ann. Cases 1916a, 707, and cases therein cited; 86 S. C. 455; 97 S. C. 9; 5 S. C. 263. *The Court can consider each challenged vote on its merits counting the votes for the respective candidates for whom cast:* 7 S. C. 241, 261; 54 S. C. 40. *As to abuse of discretion:* 86 S. C. 451; 97 S. C. 15, 18. *As to reviewing findings of fact:* 86 S. C. 455. *It was*

*unlawful to examine the challeged votes before deciding whether or not they should be counted:* 9 R. C. L. 1046; 18 Wood 550; 7 Leg. Gaz. (Pa.), cited in Col. 492 of the Cent. Dig. under the head of "Elections." *As to mutilated ballots:* 9 R. C. L. 1136, 1137; (Conn.) 17 L. R. A. 354; (Neb.) 15 L. R. A. 740; (Nev.) 29 L. R. A. 731; (Cal.) 13 L. R. A. 761; 15 L. R. A. 740; note to 47 L. R. A. 826; 98 Ky. 396; 34 S. W. 6; 15 Cyc. 356; (Nev.) 58 Pac. 284, cited in the note of 47 L. R. A. 826. *As to the challenged votes:* 97 S. C. 9; 30 So. 434; N. C. 576; 11 S. E. 655. *The actions of the committees being void, the Court may adopt any one of three methods of procedure:* 61 Col. 485; Ann. Cas. 1918a, 23.

*Messrs. Logan & Grace,* for respondents, submit: *That his being a question of certiorari, the Court will only consider the record as set up by the executive committee, and will on that record only consider questions of law and not questions of fact, unless wholly unsupported by the evidence:* 97 S. C. 80.

*Mr. Jno. P. Grace, in propria persona,* submits: *This Court having assumed jurisdiction "will retain such jurisdiction for the purpose of administering complete relief and doing entire justice with respect to the subject matter."* Cyc., vol. XVI, 106. *At to the meaning of the word "election."* Cyc., vol. XV, p. 249. *As to the executive committee:* Party Constitution; article X, Rule 1; Rule IX; Cyc., vol. VIII, 737. *As to coercion of Navy Yard employees:* Act Congress, March 2, 1867, Ch. 172; 14 Stat. L. 492; Cyc., vol. XV. 370. *As to the primary laws:* Stats. of S. C. vol. XXIX, p. 163, sec. 282; 82k, sec. 254; Act governing primary elections in "cities containing 40,000 inhabitants or more," sec. 17; 96 S. E. (N. C.) 659. *As to Court's interfering with political parties in their choice of candidates:* 172 N. C. 797; 90 S. E. 1005; 124 U. S. 200; 8 Sup. Ct. 482; 31 L. Ed. 402; 125 Minn. 249; 146 N. A. 733; 132

Iowa 38; 109 N. W. 458; 7 L. R. A. (N. S.) 572; 119 Am.
St. Rep. 539; 10 Ann. 972; 129 Iowa 244; 105 N. W. 520;
3 L. R. A. (N. S.) 382; 109 Ark. 250; 160 S. W. 230:
Ann. Cas. 1915c, 980; *Fletcher v. Tuttle,* 151, 41; 37 N.
E. 683; 25 L. R. A. 143; 42 Am. St. Rep. 220; 105 Tex.
337; 148 S. W. 292; 69 Fed. 852; 16 C. C. A. 516; 30 L.
R. A. 90; Am. & Eng. Ann. Cas., vol. XXXVII, p. 80; 48
Neb. 724; 67 N. W. 755; L. R. A. 53; 18 Colo. 26; 31 Pac
339; 88 Mich. 164; 50 N. W. 105; 43 Neb. 651; 118 Mich.
396; 76 N. W. 914; 74 Am. St. Rep. 402; 42 L. R. A. 214;
149 Mich. 1071; 112 N. W. 1071; Act 371 of the Acts of
1911; 42 S. W. (Ky.) 336.

November 11, 1919.

The opinion of the Court was delivered by MR. JUSTICE
HYDRICK.

This is a proceeding, under a writ of *certiorari,* to review
the actions of the Democratic executive committee of the
city of Charleston in ascertaining and declaring the result
of a primary election, held on August 19th last, to nominate
candidates for mayor and aldermen. The record is unneces-
sarily voluminous. It contains more than 600 pages, much
of which consists of irrelevant matter and unnecessary repe-
tition. Both sides have gone afield in attempting to inject
into the matters of which the Court cannot take cognizance
in *certiorari.* A statement in detail of all the facts, allega-
tions of fact, and contentions of the parties thereabout, and
a refutation of them, would be impossible within the limits
of an opinion of reasonable length and the time at our dis-
posal, and would serve no useful purpose. We shall state
only those which we deem of sufficient importance to require
consideration.

The petitioner, Hyde, and the respondent, Grace, were
opposing candidates for mayor and the leaders of contend-
ing factions. The petitioners, Sellers and McCarthy, were
candidates of the Hyde faction for aldermen at large from

two of the wards, and were opposed by the respondents, Michel and Bold, of the Grace faction. The petitioners, Boykin and others—40-odd in number—were voters, who allege that they voted for Hyde, and that their votes were illegally rejected by the committee. The executive committee is composed of 24 members, one from each ward club, elected by the club. The chairman of the committee was elected by the city convention, and is *ex officio* a member of the committee, having the right to vote only in case of a tie. The committee was equally divided between the two factions, and the chairman was an adherent of the Grace faction, and Mr. Grace's law partner, as was also Mr. Cosgrove, another member of the committee. The respondents, Michel and Bold, were also members of the committee, and participated in its actions complained of. The managers were bipartisan; there being two from each faction at each box.

From the count of the managers, it appeared that Hyde had a majority of one vote; the total vote for him being 3,421 against 3,420 for Grace. But it also appeared that there were in the boxes 77 votes which had not been counted, because they were challenged votes, which, under the rules, the managers were not permitted to count; but they were required to put each challenged vote in an envelope, on which the names of the voter and challenger and the grounds of challenge were indorsed, and deposit it in the box, and send it up to the executive committee for its decision. There were also, in the boxes from ward 12, 14 votes which the managers had not counted, but had inclosed in envelopes marked "mutilated ballots." These had not been counted, for the reason, as stated by the managers, that some of them had not been stamped, and the others had been scratched so as to destroy the secrecy of the ballot, to wit, one had been scratched with a blue indelible pencil, some with pen and ink, and others with black lead pencils, but so that the marks showed through on the reverse side of the ballots.

The evidence is conflicting as to the number of unstamped ballots, as to whether the secrecy of some of the so-called "mutilated ballots" was destroyed by the manner in which they were marked, and as to whether the majority of them were for Grace or Hyde.

Both candidates for mayor filed due notice and grounds of contest with the executive committee, and prayed for a recount of the vote, on the ground of the probability of error in the count, caused by the limited time and the circumstances and conditions under which the managers had to perform that duty. And 9 of the candidates for aldermen at large of the Hyde faction, who appeared from the returns to have been defeated, including the petitioners, Sellers and McCarthy, also filed a petition for a recount, alleging, as ground therefor, that, although it was known that many voters had voted for neither of the candidates for mayor, nevertheless the returns showed that the total vote for mayor exceeded that for the alderman at large in each of the wards, from which errors in the count were inferred.

The committee met at 8:30 o'clock p. m. on August 22d to hear and determine the contests and declare the result. The meeting was held in Hibernian Hall, a large and commodious building, with convenient halls and rooms for such meetings. The building is recessed some distance from the street and separated from it by a high iron fence. By order of the chairman of the committee a guard, who was of the Grace faction, was posted at the gate, with instructions, which he obeyed, to admit to the building all voters, challengers, and witnesses of the Grace faction, as they came, but to refuse admittance to those of the Hyde faction, until their names were called. As the latter were needed, they were called through a megaphone from the portico.

The committee was in session from 8:30 o'clock p. m., until 5:30 o'clock the next morning. It is alleged that during that time some of the Hyde witnesses became so wearied and fatigued from their long standing in the street that they

left and went home, and did not answer when called; that a few left because they were sick; and some of them who, according to the return of respondents, were called and did not answer, make affidavit that they were there and would have answered if they had been called, but that they were not called at all, or, if so, that they did not hear the call, on account of the noise and confusion prevailing in the street and the indistinct manner in which the names were called through the megaphone.

When the committee met, on motion of Mr. Cosgrove, which was carried by a factional vote of 13 to 12, the matter of the challenged votes was referred to the committee on canvass with power to act. The committee on canvass was a subcommittee of the executive committee, which had been appointed by the chairman before the election, under authority given him by the rules. It was composed of four members of the Grace faction and two of the Hyde faction and the chairman of the executive committee, who was *ex officio* a member of each subcommittee.

The committee on canvass then met and proceeded with the hearing as to the challenged votes, and the executive committee receded from business to await its report. Mr. Cosgrove was made secretary of the committee on canvass, and as the challenged votes were taken from the boxes they were handed to him, and he opened the envelopes in which they were contained, examined them, and made some notations on a list of the challenged voters which he had previously prepared from information obtained from challengers and others, and laid them on a table before the committee. No one was allowed to enter the room, except the witnesses, and these only one at a time, and no voter was allowed to hear the evidence given against his right to vote.

The committee did not consider the case of each challenged voter immediately after hearing the evidence with regard to his right to vote. No case was acted upon individually. But, after hearing the testimony of about 150

witnesses and fifty affidavits, bearing upon the right of the various challenged voters, Mr. Cosgrove moved that the votes of 39 of the 77, whose names he read from the list which he had, be counted, and that the others be rejected, and that motion was carried by a factional vote of 4 to 0, the Hyde members refusing to vote; 26 of the 39 counted were for Grace, and 11 for Hyde, and 2 for neither. The secretary of the executive committee was then instructed to add to the returns of the managers for mayor and aldermen the challenged votes, as allowed by the committee on canvass, which gave Mr. Grace a majority of 14 votes. Mr. Burguson then moved that the committee consider the alleged mutilated ballots. Mr. Logan said that the only matter referred to this committee was the challenged votes, and that the motion was out of order. The committee then adjourned.

The executive committee was then called to order to receive the report of the committee on canvass. Mr. Cosgrove made the report for the committee verbally. He read from the list which he had the names of the 39 voters whose votes the subcommittee had decided to count, and those that it had decided to reject, and moved the adoption of the report, which motion was carried by a factional vote, and Mr. Grace and the other candidates who had received majorities according to the count of the managers, were declared the nominees. The evidence taken by the subcommittee was not reported to the executive committee, verbally or otherwise.

Mr. Grimball moved the executive committee, in view of the closeness of the vote and the possibility of an application to the Courts to review the election, and the importance, in that event, of the preservation of the records, that the ballots and all records of whatever nature be placed in a package under the seal of the committee, and kept in a safe place under the control of the chairman for 60 days. That motion was rejected.

Petitioners allege that the acts and omissions hereinbefore stated were so arbitrary, capricious, and unfairly partisan as to constitute oppressive abuse of the power and discretion vested in the committee, and that they amounted to errors of law, which were prejudicial to their rights.

Respondents question the jurisdiction of the Court on two grounds: Their first ground is that the matters in controversy are only political in their nature, and should, therefore, be left to the decision of those in whom the party in convention vested the power to decide them. That is a misconception of the issues, which are not of a political nature at all, but rather of a legal nature, to wit, whether the result of the election was ascertained and declared in the manner prescribed by law.

Their second ground is that the legislature has taken from the Courts the power to review the actions of the committee. That contention rests upon an inference sought to be drawn from the provision in section 282k, as added to Civ. Code 1912 by the act of 1915 (29 St. at Large, 163) that:

"The State committee shall also review, on appeal, the decision of the county committee as to county officers, and members of the General Assembly, *and its action shall be final.*"

Respondents contend that the words of the statute italicized deny, by implication, the jurisdiction of the Court to review the actions of the State committee, and, by an implication based upon that implication, the jurisdiction to review the actions of the city committee.

The first implication suggested is neither a necessary one nor, indeed, a reasonable one. The Courts of this State have always exercised jurisdiction to review the decisions of those appointed by law to hold and ascertain the result of all elections held pursuant to law, and ever since party primaries have been regulated by statute a like jurisdiction has been exercised with regard to them.

In *Ex parte Sanders*, 53 S. C. 478, 31 S. E. 290, decided in 1898, the late Chief Justice McIver, after quoting from the statute regulating primaries, said:

"It is evident from the above extracts that the legislature intended to give primary elections a legal status, and to place them, together with the entire party machinery, under the protection of the Courts, not only for the purpose of preventing frauds, but also for the enforcement of rights acquired therein."

While that decision was rendered by only one member of the Court, it was based upon sound reasons, and has been followed ever since by the Court, as will appear by reference to numerous cases since decided. These decisions were known to the legislature, and surely, if that body had intended to deny to the Courts a jurisdiction which they had so long and so frequently exercised, it would not have undertaken to do so in words of doubtful import, but in plain and unmistakable terms. The words italicized were intended to mean no more than that the decision of the State committee shall be final only so far as the councils of the party are concerned.

Respondents demurred to the petition of Boykin and others, the challenged voters whose votes were rejected, for insufficiency. It is unnecessary to decide in this case whether, or, if so at all, under what circumstances, an individual voter, or a number of voters, may have their right to vote and to have their votes counted determined by the Courts, because, in the view which we have taken of the case made by the petition of Hyde and others, it becomes unnecessary to consider the petition of Boykin and others, and, therefore, unnecessary to decide the issues raised by it or by the demurrer to it.

Respondents moved to strike from the record the names of petitioners, Sellers and McCarthy, on several grounds,

only one of which need be considered, to wit, that they have not made it appear that they suffered any injury by reason of the wrongs alleged. These petitioners rely chiefly upon two grounds of error on the part of the committee: The first is in allowing their opponents, Michel and Bold, to participate in the decision of questions before the committee. No doubt Michel and Bold were disqualified by reason of their interest in the result, and it was error to allow them to act with the committee. It is contrary to law and the common sense of justice of all mankind that any man shall be a judge in his own case, or in a case in which he is interested, except in case of necessity, which did not exist in this case.

But the rule is well settled that errors which do not appear to have affected the result will not be allowed to overturn an election, and every reasonable presumption will be indulged to sustain it. By the returns of the managers, Bold's majority over McCarthy was 167, and Michel's over Sellers was 261. At most, there were only 91 votes contested, and, if all these were given to these petitioners, their opponents would still have a majority, from which it appears that they were not prejudicially affected by any or all of the actions and omissions of the committee with regard to the contested votes.

The other ground upon which they seek relief is the refusal of their petition for a recount, which they prayed for because it appeared from the returns that the combined vote for mayor exceeded that for aldermen, although it was known that many voters had not voted for either candidate for mayor, from which they inferred that there had been errors in the count. But the fact stated does not warrant the inference suggested as being even probably true, since it is equally, if not more, probable that a greater number of voters failed to vote for aldermen than for mayor It was not enough for petitioners to make it appear that there were possible errors in the count. They should have

made out at least a probable case, which they failed to do. As there was no evidence offered tending to prove that there were errors in the count, the presumption is that it was correct, and there was no error in refusing their petition.

There is another reason why the disqualification of Michel and Bold cannot now avail these petitioners. They knew of it, and made no objection at the time. Under our decisions, the action of a disqualified Judge is not void, but only voidable. *Ex parte Hilton,* 64 S. C. 201, 41 S. E. 978, 92 Am. St. Rep. 800; *Jeffers v. Jeffers,* 89 S. C. 244, 71 S. E. 810.

In this connection we overrule the contention that Messrs. Logan and Cosgrove were disqualified to act on the committee, because they were partners of Mr. Grace. That fact did not disqualify them, because they had no personal interest in the result.

As to the separation of the witnesses. It appears that this was done by order of the chairman of the executive committee, as a precautionary measure, on account of the intensely bitter and hostile feeling existing between the factions, to prevent breaches of the peace and possible rioting and bloodshed, which might have resulted, if they had been allowed to come in close contact with each other in the committee room, or in the building. The purpose was certainly commendable. No objection was made at the time, and, as that was a matter in the discretion of the committee, we cannot hold that it was error of law, even though some prejudice may have resulted to the petitioner from the manner in which it was carried out. Suggestions are now made as to how the separation might have been as effectually made and carried out, so as to afford like comfort and convenience to the Hyde men as were afforded to the Grace men. Suffice it to say that those suggestions were not made to the committee at the time.

However, in this connection, it may not be out of place to observe that the right to vote is a substantial right, pro-

tected by law; and a voter, whose right to vote has been challenged, should be allowed to hear the evidence against his right, in order that he may have opportunity to adduce evidence in rebuttal, or in support of his right. The discretion to exclude witnesses rarely, if ever, extends to the exclusion of the parties to a cause.

The most important point in the case is the error imputed to the executive committee in referring the challenged votes to the committee on canvass, with power to act. By the terms of the statute and rules of the party, the power to hear and determine contests is vested in the executive committee. That the power "to hear and determine" is judicial, and that judicial power cannot be delegated, cannot be, and is not, denied. We are not called upon to decide whether, if the executive committee had heard the evidence taken by the subcommittee, and had rendered its decision upon its own independent consideration of the evidence so taken, its action would have been valid, because the undisputed fact is that it did not do so, but merely adopted the decision of the subcommittee, without hearing the evidence upon which its findings were based.

Respondents seek to sustain this action of the committee on two grounds: First, that the committee made the rules and had the right to interpret them, and that the reference of the challenged votes was its declaration of the meaning of its rules. No doubt the committee had the right to interpret the rules, but it had not the right by interpretation to give them a meaning of which their language is not susceptible. Rule 25 reads: "The executive committee shall, three days after the primary, assemble, hear and determine all contests and protests and decide the result of the primary."

It is impossible by interpretation to give that language any other meaning than that the committee itself shall hear and determine all contests, etc.

Respondents contend, second, that, having the power to make the rules, the committee had the power to amend them at any time, and that its action should be construed and held to be an amendment of the rules to conform thereto.

That contention cannot be sustained by reason or authority. The effect of it would be the abrogation of all rules and the substitution therefor of the arbitrary will of the committee. The purpose in adopting rules is to have an established and orderly system of procedure, and thereby forestall the possibility of uncertain, variable, and arbitrary action. Webster defines a rule to be: A prescribed guide for conduct or action; a governing direction; and authoritative enactment.

The statute contemplates the adoption of rules before an election for the conduct thereof, and impresses upon them, when adopted, the force of law. It says: "Except as herein provided, the primary shall be conducted in accordance with the party rules."

A reading of that statute, as well as the general law regulating primaries, leaves no room for doubt that the legislature intended that the rules governing an election should be adopted before the election, and that the election must be conducted in accordance with the rules so adopted. No doubt the committee had power to amend the rules a reasonable time before an election, but not afterwards, so as to make the amendments applicable to an election already held.

We are not to be understood by what has been said as conceding the power to amend the rules, so as to enable the committee to refer the decision of contests, for the power to hear and determine contests is vested in the committee, not only by its own rules, but by the statute as well, and there is no provision in the statutes by which the committee is authorized to delegate the judicial power vested in it.

In view of the principles already stated that errors which do not appear to have affected the result will not be allowed

to overturn the decision of the local authorities as to an election, and that every reasonable presumption will be indulged to sustain their action, we have carefully examined the testimony taken before the subcommittee, not with the view of giving it our own original consideration and determining the result, for we have no authority to do so, but merely for the purpose of ascertaining whether, if it had been considered by the executive committee, any other conclusion could in reason have been reached than that which was reached by the subcommittee; for, if the evidence adduced was susceptible of no other reasonable inference than that drawn by the subcommittee, it can hardly be said that the failure of the executive committee to hear and consider it was prejudicial error. But, upon that examination we find that in some of the cases, the decisions of the subcommittee were predicated upon incompetent testimony, such as opinion and hearsay; in a few cases, the decisions were contrary to law, there being only one reasonable inference from the facts, which the committee failed to adopt; and in most of them, while the evidence was fairly susceptible of the inference drawn by the committee, it was also susceptible of a contrary inference; and there were enough of such cases to have affected the result, and made a decision possible for either of the candidates for mayor, according to the view of the testimony which the executive committee might have entertained, if it had considered it.

We are, therefore, constrained to hold that the action of the executive committee in referring the challenged votes was error of law which was prejudicial to the rights of the petitioner, Hyde.

The executive committee erred, also, in refusing to consider the alleged mutilated ballots. The difference in the votes between the candidates for mayor was so small that a proper decision as to these ballots might have changed the result. The decision of the managers that they were mutilated and should not be counted was not

final or binding upon either party. Under the statutes and rules, the duties of the managers are chiefly, if not wholly, ministerial. At any rate, we find nothing in either which makes their decision upon that issue conclusive. As has already been stated, the evidence is conflicting as to whether these ballots were all so scratched as to destroy their secrecy, and also as to the candidate for whom they were cast. Inspection of the ballots would most probably have settled those conflicts beyong doubt. It would certainly have removed any doubt as to how many of them were unstamped and as to the candidate for whom they were cast.

Neither the statutes nor the rules prescribe any particular instrument with which the ballots shall be scratched. Both prescribe, however, that they shall be so scratched and folded that the secrecy thereof shall not be revealed. The fact that a ballot was scratched, either with pencil or pen, so that the marks show through on the opposite side, does not necessarily warrant the inference that the secrecy thereof was destroyed, because it may have been folded so that no one could tell, without unfolding it, whose names had been scratched. The committee should have examined the ballots, and should have decided themselves whether they were unstamped or mutilated, and for whom they had been cast.

From what has been said, it is clear that we cannot determine from the record before us which of the candidates for mayor received the majority of the votes that were and ought to have been counted. We cannot, therefore, sustain the contention of the petitioner that the Court will consider the votes and declare the election. Nor can we sustain the contention that, in the absence of a declaration of the executive committee, the count of the managers should be sustained as a declaration of the result. Under the statutes and rules the managers were not authorized to declare the result. That was for the executive committee, and it has not done so according to law. It follows that all

that we can do is to hold that the result of the election has not been legally ascertained and declared, and that the actions of the executive committee in attempting to do so were affected by errors of law, prejudicial to the petitioner, Hyde, and must be set aside, and it is so adjudged.

MR. CHIEF JUSTICE GARY and MR. JUSTICE FRASER concur.

MR. JUSTICE WATTS, *dissenting.* I cannot concur in the opinion of Mr. Justice Hydrick. In my ouinion the controlling and crucial point involved in the case is the legal one: Did the executive committee have the right to refer the matters that they did to a subcommittee, which subcommittee was to report back to the executive committee for their action, which was done, and the full executive committee did act? Under a writ of *certiorari* this Court can only consider the record set up by the executive committee, and on that record only consider questions of law, and not questions of fact, unless their findings are wholly unsupported by the evidence.

The campaign between Mr. Hyde and Mr. Grace was conducted with almost unparalleled and unprecedented bitterness. At the primary over 7,000 votes were cast; 70 votes were challenged and 14 votes are in dispute. The 7,000 voters are not complaining; they are satisfied, apparently, with the result. A primary election cannot be conducted in the same orderly manner that a case is tried in Court. Neither can the executive committee decide a contest as a case is tried. The executive committee have no sheriff to enforce attendance of witnesses and carry out their orders, with the power, if necessary, of summoning a *posse comitatus,* but have to do the best they can and exercise common sense and follow the usual custom in such matters.

Primaries belong to the political branch of the government, and as a general rule are beyond the control of judicial

power. As nothing is involved in this but political rights, I am opposed to the Court's interference in any form.

The petitioners have recognized the importance of controlling the executive committee, for an effort was made to this Court to interfere with the formation and composition of it, which proceeding was dismissed. I am decidedly of the opinion that the executive committee had the right to refer to subcommittee, and they confirmed the subcommittee's report and recommendations, which, to all intents and purposes, was the action of the executive committee, the same as if they had heard and determined the contest in the first instance.

The President's election in 1876, after the creation of the Electoral Commission, was decided by a vote on party lines. During the bitter contests in the '90's all contests were decided on factional lines. The proceedings show that on every vote before the executive committee they voted on factional lines, and I feel that I would stultify myself if I were to say that the executive committee would have voted differently, had there been no subcommittee. I have no doubt that the vote would have been the same. The question before us is essentially political, and not judicial, in its character, and the interference by the Courts is dangerous and contrary to the liberty of voters and freedom of elections, and inimical to the doctrine, rules, customs, and usages of political parties. No such power has been conferred on this Court, except as heretofore indicated, and if it were I would loath to exercise it in the case before us. If petitioners feel aggrieved, and feel absolved from their oath to support the party's nominees, they should have it determined by the voters in the general election. I do not feel that the people of Charleston, under the showing made, should have inflicted on them another election, with its bitterness, opening of old wounds, and chances for bloodshed and riot. The Grace faction has a large majority of the aldermen unquestionably. The executive committee decided the contest

before it, and declared the result, acting within the scope of the authority vested in them. Their decision of facts cannot be reviewed by us in the proceedings before us. Their decision on the fact is final, and no errors of law have been committed, and I think the proceedings should be dismissed.

MR. JUSTICE GAGE concurs.