516 S.E.2d 206

G. Robert GEORGE, Steve M. Kearse, Mary Ellen Warner, Dorothy M. Humphries, Barbara H. Miller, and the City of Charleston Republican Party, Appellants,

v.

MUNICIPAL ELECTION COMMISSION OF THE CITY OF CHARLESTON, Respondent.

No. 24941.

Supreme Court of South Carolina.

Heard April 20, 1999.
Decided May 3, 1999.

Samuel W. Howell, IV, and Edward M. Whelan, of Haynsworth, Marion, McKay & Guerard, LLP, Charleston, for appellants.

William B. Regan and Frances I. Cantwell of Regan & Cantwell, Charleston, for respondent.

WALLER, Justice:

G. Robert George, the City of Charleston Republican Party, and others (Appellants) contested the results of a special municipal election in Charleston. The three-member Municipal Election Commission of the City of Charleston (Commis-

sion) voted unanimously to uphold the results of the election. The circuit court affirmed Commission's decision. We reverse.[1]

## FACTS

Commission learned in September 1998 that it had to organize a special election to be held November 3, 1998, the same day as the general election. Voters would decide whether the city's elections would be changed from partisan to nonpartisan. Commission traditionally had worked with Charleston County officials during elections, using the county's electronic voting machines and getting help from county precinct workers. This time, county election officials were unable to assist Commission due to the length and complexity of the ballots in county, state, and national races, although the county did provide some poll managers in the city election.

On Election Day, city voters signed in at their polling places and cast their ballots in county, state, and national races on the county's electronic voting machines. The machines were contained in separate booths that ensured voters' privacy. City voters then walked to a nearby table six to eight feet in length. They signed in again and were given a punch-card ballot to vote on the city referendum. After voting, they dropped the ballots in a sealed cardboard box on the table. Commission officials instructed poll managers to allow voters who desired more privacy to step away from the table, turn around, or shield their ballot by holding it behind the ballot box while completing it.[2]

---

1. We granted the parties' request in February 1999 to expedite this appeal. *See* Rule 234(b), SCACR 1999 is a general election year in the City of Charleston, including elections for mayor and six council seats. Prospective candidates must file a petition with Commission no later than May 20, 1999, in order to compete in the primary election August 3, 1999. Thus, it is important to know whether the 1998 referendum, which changed city elections from partisan to nonpartisan, was a valid election.

2. Voters also elected Paul E. Tinkler to fill the vacant seat in city council District 9. Appellants initially challenged Tinkler's election, but stipulated to the dismissal of that appeal before the circuit court. Consequently, Tinkler's election to the District 9 seat is not affected by our decision.

Commission held a hearing November 9, 1998, after appellants contested the results. All parties and Commission stipulated that (1) Commission did not provide voting booths in any city precincts, and the majority of voters in the city election did not vote in a voting booth; and (2) punch-card ballots used in the city election were not designed to be folded because they were counted by a computer, and the majority of voters did not fold the ballots.

Appellants presented no evidence or witnesses at the hearing, but grounded their arguments in the stipulations. Appellants conceded no one testified he or she saw the vote made by another person, no one testified he or she refused to vote due to the method of voting, and no one testified he or she was confused or intimidated during the process.

Candidate Paul E. Tinkler, one of Tinkler's poll watchers, and two voters called by the Committee for Nonpartisan Elections testified they believed the method of voting sufficiently protected their right to cast a secret ballot. They simply cupped their ballots in one hand, punched the desired slot, and dropped them in the box. Other voters usually were standing in nearby lines when voters completed the city ballots.

City residents voted to change municipal elections in the city of Charleston from partisan to nonpartisan by a vote of 8,929 to 6,310. Appellants contend the circuit court erred in affirming Commission's decision to uphold the election results.

## ISSUE

Did the total absence of voting booths and the use of punch-card ballots that were not designed to be folded violate the state constitution or statutes?

## DISCUSSION

Appellants contend the state constitution and statutes required Commission to provide voting booths and ballots that may be folded in order to ensure each voter's right to cast a secret ballot. They argue the Court should nullify the referendum results due to the total lack of booths and foldable ballots. We agree.

 In municipal election cases, this Court reviews the judgment of the circuit court upholding or overturning the decision of a municipal election commission only to correct errors of law. The review does not extend to findings of fact unless those findings are wholly unsupported by the evidence. *Knight v. State Bd. of Canvassers*, 297 S.C. 55, 374 S.E.2d 685 (1988); *May v. Wilson*, 199 S.C. 354, 19 S.E.2d 467 (1942). The Court will employ every reasonable presumption to sustain a contested election, and will not set aside an election due to mere irregularities or illegalities unless the result is changed or rendered doubtful. *Sims v. Ham*, 275 S.C. 369, 271 S.E.2d 316 (1980); *May v. Wilson, supra.*

 The statutory provisions regulating the conduct of elections are numerous and detailed. S.C.Code Ann. §§ 7–13–10 to –2220 (1976 & Supp.1998); S.C. Const. art. II, § 10. This Court, like many others, recognizes that perfect compliance in every instance is unlikely, and the Court is loathe to nullify an election based on minor violations of technical requirements. To that end, courts have developed principles to determine whether such provisions are mandatory or directory.

 As a general rule, such provisions are mandatory in two instances: when the statute expressly declares that a particular act is essential to the validity of an election, or when enforcement is sought before an election in a direct proceeding. After an election in which no fraud is alleged or proven, when the Court seeks to uphold the result in order to avoid disenfranchising those who voted, such provisions are merely directory even though the Legislature used seemingly mandatory terms such as "shall" or "must" in establishing the provisions. "Courts justly consider the main purpose of such laws, namely, the obtaining of a fair election and an honest return, as paramount in importance to the minor requirements which prescribe the formal steps to reach that end, and, in order not to defeat the general design, are frequently led to ignore such innocent irregularities of election officers as are free of fraud, and have not interfered with a full and fair expression of the voter's choice." *State ex rel. Parler v. Jennings*, 79 S.C. 414, 419, 60 S.E. 967, 968–69 (1908); *accord Laney v. Baskin*, 201 S.C. 246, 253, 22 S.E.2d 722, 725 (1942);

*Smoak v. Rhodes,* 201 S.C. 237, 241, 22 S.E.2d 685, 686 (1942); *Killingsworth v. State Executive Comm. of Democratic Party,* 125 S.C. 487, 492, 118 S.E. 822, 824 (1921); *State ex rel. Davis v. State Bd. of Canvassers,* 86 S.C. 451, 460, 68 S.E. 676, 680 (1910).

The Court still may deem such provisions to be mandatory after an election—and thus capable of nullifying the results—when the provisions substantially affect the free and intelligent casting of a vote, the determination of the results, an essential element of the election, or the fundamental integrity of the election. *Zbinden v. Bond County Community Unit School Dist. No. 2,* 2 Ill.2d 232, 117 N.E.2d 765, 767 (1954); *Lewis v. Griffith,* 664 So.2d 177, 186 (Miss.1995); *O'Neal v. Simpson,* 350 So.2d 998, 1005–09 (Miss.1977); *Mittelstadt v. Bender,* 210 N.W.2d 89, 94 (N.D.1973). Furthermore, "where there is a total disregard of the statute, it cannot be treated as an irregularity, but it must be held and adjudicated to be cause for declaring the election void and illegal." *Moon v. Seymour,* 182 Ga. 702, 186 S.E. 744, 745 (1936); *accord Lewis v. Griffith, supra.* "The Court . . . will not sanction practices which circumvent the plain purposes of the law and open the door to fraud." *May v. Wilson,* 199 S.C. at 360, 19 S.E.2d at 470.

With those principles in mind, we turn to the provisions at issue in this case.

"All elections by the people shall be by secret ballot. . . ." S.C. Const. art. II, § 1.[3] Secret ballots have been required since at least 1907, when the Court interpreted a provision in the original 1895 constitution for voting "by ballot" to mean voting by secret ballot. *State ex rel. Birchmore v. State Bd. of Canvassers,* 78 S.C. 461, 468–69, 59 S.E. 145, 147 (1907); *see also State v. Shaw,* 9 S.C. 94, 132–45 (1877) (plainly indicating, while interpreting 1868 state constitution, that voting "by ballot" impliedly means by secret ballot). Section 1 of Article

---

3. Section 1 of Article II states in full:

All elections by the people shall be by secret ballot, but the ballots shall not be counted in secret. The right of suffrage, as regulated in this Constitution, shall be protected by laws regulating elections and prohibiting, under adequate penalties, all undue influence from power, bribery, tumult, or improper conduct.

II was amended in 1971 to include the term "secret ballot." Act No. 277, 1971 Acts 319.

The Legislature explicitly has declared "[t]he right to vote of each person so entitled and the secrecy of the ballot shall be preserved at all times." S.C.Code Ann. § 7–13–130 (1976). That legislative goal is evident in several statutory provisions. *See* S.C.Code Ann. § 7–13–1830 (1976) (after helping a voter understand how to use a voting machine, the poll managers "shall, before the voter has voted, retire and such voter shall cast his ballot in secret"); S.C.Code Ann. § 7–13–771(D) (Supp.1998) (after an elderly or handicapped person votes in his or her vehicle outside a polling place, the voter "must fold [the ballot] so that the secrecy of the ballot is preserved and return it to the managers waiting outside the vehicle. The managers shall carry the ballot to the ballot box, taking care not to violate the secrecy of the ballot, and after detaching the stub, deposit the ballot in the ballot box"); S.C.Code Ann. 7–13–1380 (1976) ("The State Election Commission in specifying the form of the ballot shall provide for ballot secrecy in connection with write-in votes").

History demonstrates the importance of the secret ballot. In the early years of our nation, voters expressed their preferences orally or by a showing of hands. With the advent of paper ballots in the late 1700s, individuals prepared their own handwritten ballots at home, marked them, and took them to the polling place. Later, political parties and candidates printed their own specially colored or designed paper ballots for voters to use. None of the methods was secret and all were open to widespread intimidation of voters, fraud, and violence. *Burson v. Freeman,* 504 U.S. 191, 200–206, 112 S.Ct. 1846, 1852–54, 119 L.Ed.2d 5, 15–19 (1992) (upholding Tennessee statute prohibiting solicitation of votes and display of campaign materials within 100 feet of entrance to polling place); G.H. Utter and R.A. Strickland, *Campaign and Election Reform: A Reference Handbook,* 8–9 (1997); Wright and Graham, *Federal Practice and Procedure: Evidence,* § 5632 (1992) (discussing history of secret ballot in connection with rejected rule of evidence on voter's privilege).

Polling places on Election Day, unlike today's typical experience of waiting quietly in line, often were "scenes of battle, murder, and sudden death." In addition to real violence,

sham battles were staged to frighten away elderly and timid voters. *Burson v. Freeman,* 504 U.S. at 202–04, 112 S.Ct. at 1853–54, 119 L.Ed.2d at 16–17. One writer described Election Day in 1856, for example, as a "knock-down, dragged-out fight" in many areas of the country. Thugs forced voters at the polls to reveal their voting ticket, then beat or shot them and forcibly tore up the opposing party's ticket if they refused to vote as ordered. Sheriffs were unable to find men willing to risk their lives to control the violent mobs. In his 1931 autobiography, journalist Lincoln Steffens, commenting on a more peaceable form of vote solicitation, observed that the going rate for a vote in his Connecticut hometown was $2.50 to $2.75. J. Mitchell, *How to Get Elected: An Anecdotal History of Mud–Slinging, Red–Baiting, Vote–Stealing and Dirty Tricks in American Politics,* 45–46, 88 (1992).

To combat violence and corruption, most states adopted the secret ballot—sometimes called the Australian ballot system because it was first used in that country—and other measures in the 1880s and 1890s. *Burson v. Freeman, supra;* Utter & Strickland, at 42–46. When explaining the importance of the secret ballot to our system of representative democracy, the reasons most often given are to reduce or eliminate the potential intimidation of voters, to reduce or eliminate the chance for voters who are willing to sell their votes to prove they have "delivered the goods" by allowing someone to watch them cast their ballot, and to ensure the overall integrity of the electoral process. *State ex rel. Edwards v. Abrams,* 270 S.C. 87, 92, 240 S.E.2d 643, 645–46 (1978); *Peterson v. City of San Diego,* 34 Cal.3d 225, 193 Cal.Rptr. 533, 666 P.2d 975, 976 (1983); *Moon v. Seymour,* 186 S.E. at 745; *Clark v. Quick,* 377 Ill. 424, 36 N.E.2d 563, 566 (1941); *Evans v. Reiser,* 78 Utah 253, 2 P.2d 615, 625 (1931), *superseded by statute on other grounds as stated in Mosier v. Gilmore,* 635 P.2d 55 (Utah 1981); *Sims v. Atwell,* 556 S.W.2d 929, 933 (Ky.Ct.App. 1977); 26 Am.Jur.2d *Elections* §§ 299, 328 (1996).

This Court has held that secrecy of the ballot was violated when a husband and wife were allowed to enter the voting booth together and discuss their vote, *Edwards v. Abrams,* 270 S.C. at 91–93, 240 S.E.2d at 645–46; when the numbering system for ballots and voter sign-in lists could be used to identify a particular voter's ballot, *Corn v. Blackwell,* 191 S.C. 183, 4 S.E.2d 254 (1939); and when voters were required to

place their ballots in "for" and "against" boxes that plainly revealed their choice, *Birchmore v. State Bd.*, 78 S.C. at 471–72, 59 S.E. at 148. Although the records in those cases revealed no actual proof of intimidation or fraud, the procedures substantially affected an essential element of the election (secrecy of the ballot), as well as the fundamental integrity of the election. "While in this particular instance it is possible that no evil results followed from the mode in which the election was conducted, yet we cannot be unmindful of the fact that we must be guided by those general principles of law and policy that will enable us to determine future litigations, under the election laws of the state consistently." *Birchmore v. State Bd.*, 78 S.C. at 472, 59 S.E. at 148 (nullifying election results).

## A. THE VOTING BOOTH

■ Municipal elections must be conducted pursuant to the South Carolina Election Law contained in Title 7, with any necessary changes in points of detail. S.C.Code Ann. § 5–15–10 (1976). The Legislature has established explicit requirements for voting booths.

There must be provided at each polling precinct at least one booth. At least one booth must be provided for each two hundred and fifty registered electors or a major fraction thereof of the precinct. The booths must be made of wood, sheet metal, or other suitable substance; must not be less than thirty-two inches wide, thirty-two inches deep, and six feet six inches high; must have a curtain hanging from the top in front to within three feet of the floor; and must have a suitable shelf on which the voter can prepare his ballot. In primary, general, and special elections, the booths must be provided by the commissioners of election or other electoral board. Only one voter shall be allowed to enter a booth at a time, and no one except as provided herein is allowed to speak to a voter while in the booth preparing his ballot.

S.C.Code Ann. § 7–13–740 (Supp.1998).

The Court has indicated that minor variations in the design of a voting booth are not likely to prompt it to void an election. *Smoak v. Rhodes*, 201 S.C. at 241, 22 S.E.2d at 686 ("It will not be contended that a few inches one way or the other in these matters [size of booth or length of curtain screening

booth] would vitiate an election"); *Killingsworth v. State Executive Comm. of Democratic Party,* 125 S.C. at 492, 118 S.E. at 824 (same). The Court has not, however, decided a case in which voters were not provided with any voting booths at all.

Courts that have considered the issue disagree on it. The Georgia Supreme Court has held that a statute requiring election officials to provide booths is mandatory, and nullified an election in which election officials totally disregarded the statute by providing no booths. *Moon v. Seymour,* 186 S.E. at 745; *see also Cox v. Williams,* 216 Ga. 535, 117 S.E.2d 899 (1961) (nullifying referendum results due to numerous irregularities, including the lack of screened voting booths). The North Dakota Supreme Court has taken the opposite view, holding that secrecy was adequately ensured in a school bond election by allowing voters to use three large tables in a large room. The court emphasized it did not intend to minimize the importance of voting booths. *Mittelstadt v. Bender,* 210 N.W.2d 89, 95–96 (N.D.1973).

In a similar case, the Missouri Supreme Court refused to nullify a school bond election based on the lack of voting booths because the one-question ballot was easily concealed while marking it. *Lake v. Riutcel,* 249 S.W.2d 450, 451 (Mo.1952); *see also Cashen v. Bd. of Education,* 2 Ill.App.2d 490, 119 N.E.2d 823, 824–25 (1954) (upholding results in school board election where no booths were provided; no statute required the use of booths in such elections).

In this case, it is undisputed that Commission did not provide any voting booths, and that the record contains no actual proof of voter intimidation or fraud. We acknowledge that Commission's decision to proceed without booths is understandable, given the hasty preparations and the inability of Charleston County officials to provide their traditional assistance. Nothing in the record suggests Commission failed to appreciate the importance of its responsibilities.

Absent the several statutes that address the secret ballot requirement of Article II, Section 1, we would be less constrained in deciding whether Commission met the constitutional requirement in this case. However, we are guided both by the constitution and the Legislature's explicit instructions on how to ensure the right to a secret ballot.

We conclude this election challenge is not one in which we are faced with minor violations of technical requirements. The history of the secret ballot, our precedent, and the statutes persuade us that the voting booth is an essential element of the electoral process. The lack of any evidence of voter intimidation or fraud is not dispositive because the total absence of booths affects the fundamental integrity of the election. *See Edwards v. Abrams, supra; Corn v. Blackwell, supra; Birchmore v. State Bd., supra.* We cannot condone the method of voting employed by Commission because it would unwisely sanction a practice that "circumvent[s] the plain purposes of the law and open[s] the door to fraud" and intimidation. *May v. Wilson,* 199 S.C. at 360, 19 S.E.2d at 470.

Accordingly, we choose to follow the view espoused in *Moon v. Seymour, supra,* and hold that the statutory provision for voting booths is mandatory in these circumstances. Therefore, the total absence of voting booths violates the constitutional and statutory right to a secret ballot.

## B. THE BALLOT

■ The Legislature has required that election officials prepare ballots which are designed to be folded. After signing in to vote, the

> voter shall immediately go to the booth and mark his ballot preparatory to depositing it in the ballot box. After the voter has marked his ballot, he shall fold it so as to leave the stub remaining attached thereto visible in such position that it can be detached without unfolding. When the ballot is returned, one of the managers shall detach and retain the stub, and the voter shall then deposit his folded ballot in the box.

S.C.Code Ann. § 7–13–730 (1976); *see also* S.C.Code Ann. § 7–13–611 (Supp.1998) (ballot form containing instructions for voter to fold the ballot). Punch-card ballots used in vote tabulating machines must have serially numbered stubs and strips, which "shall be attached to each ballot card in a manner and form similar to that prescribed by law for paper ballots." S.C.Code Ann. § 7–13–1370 (1976). Regulations promulgated by the State Election Commission require punch-card ballots either to be placed in an envelope by the voter or

be foldable to ensure secrecy of the ballot. 24 S.C.Code Ann.Reg. 45–5 (1976).

The purpose of folding the ballot is to ensure secrecy. *Gardner v. Blackwell,* 167 S.C. 313, 322, 166 S.E. 338, 341 (1932); *Hyde v. Logan,* 113 S.C. 64, 81, 101 S.E. 41, 46 (1919). In *Smoak v. Rhodes,* the Court refused to nullify an election in which the record contained no proof that ballots were not folded or that the secrecy of the ballot was violated. *Id.,* 201 S.C. at 243–44, 22 S.E.2d at 687–88. In this case, however, it is undisputed that voters were specifically instructed *not* to fold the ballots.

We hold that the use of ballots that were not designed to be folded violates the constitutional and statutory right to a secret ballot. We do so for the same reasons expressed in connection with the absence of the voting booth. The provision for foldable ballots is mandatory because it affects an essential element of the election and the fundamental integrity of the electoral process.

## CONCLUSION

We reverse the circuit court's order and nullify the referendum results because the total absence of voting booths and foldable ballots violates the statutory and constitutional right to a secret ballot.

REVERSED.

FINNEY, C.J., TOAL, MOORE, and BURNETT, JJ., concur.