594 S.E.2d 261

W.J. DOUAN, Petitioner,

v.

CHARLESTON COUNTY COUNCIL and Charleston County Election Commission, Respondents.

and

Wallace B. Scarborough, as an individual South Carolina Representative, G. Robert George, Larry D. Shirley, Henry B. Fishburne, Jr., as individual City of Charleston Councilmen, Lawrence A. Carr, as an individual Town of Mount Pleasant Councilman, Mary G. Clark, individually as Mayor of the Town of James Island, Joe Qualey, Bill Wilder, Parris Williams, Bill Woolsey, as individual Town of James Island Councilmen, A.C. Mitchum, individually as a City of North Charleston Councilman, Eugene Platt, individually as a James Island Public Service District Commissioner, Bob Linville, individually as a City of Folly Beach Councilman, Ann G.H. Rounds, Jaroslaw Burbello, Warwick Jones, and Patricia Jones, as individual voters, Petitioners,

v.

Charleston County Election Commission, Respondent.

No. 25707.

Supreme Court of South Carolina.

Heard June 10, 2003.

Decided Aug. 25, 2003.

Rehearing Denied Dec. 17, 2003.

602

Thomas R. Goldstein, of Belk, Cobb, Infinger & Goldstein, P.A., of Charleston, for Petitioner Douan; Trent M. Kernodle and Christine Companion Varnado, of Kernodle, Taylor & Root, of Charleston, for Petitioner Scarborough, et al.

Mikell Ross Scarborough, of Charleston, for Respondent Charleston County Election Commission.

Joseph Dawson, III, Bernard E. Ferrerra, Jr., and W. Kurt Taylor, of Charleston, for Respondent–Intervenor Charleston County Council.

Charlton deSaussure, Jr., John P. Linton, and Sarah P. Spruill, of Haynsworth Sinkler Boyd, P.A., of Charleston, for City of Charleston and CARTA, Amicus Curiae.

J. Brady Hair, of North Charleston, for City of North Charleston, Amicus Curiae.

R. Allen Young, of Mt. Pleasant, for Town of Mt. Pleasant, Amicus Curiae.

Chief Justice TOAL.

W.J. Douan et al. ("Petitioners") challenge the State Election Commission's decision to uphold the election results for the Sales and Use Tax Referendum ("Referendum") presented to voters during the 2002 general election in Charleston County.

## FACTUAL/PROCEDURAL BACKGROUND

In 1995, the General Assembly enacted S.C.Code Ann. §§ 4-37-10 et seq. (Supp.2002) to provide counties with an optional method of financing transportation facilities. Section 4-37-30 empowers counties to impose a sales and use tax in order to raise revenue for transportation related projects. Section 4-37-30 provides, in relevant part,

(A) Subject to the requirements of this section, the governing body of a county may impose by ordinance a sales and use tax in an amount not to exceed one percent within its jurisdiction for a single project or multiple projects and for a specific period of time to collect a limited amount of money.

(1) The governing body of a county may vote to impose the tax authorized by this section, subject to a referendum, by enacting an ordinance. The ordinance must specify:

(a) the project or projects and a description of the project or projects for which the proceeds of the tax are to be used, which may include projects located within or without, or both within or without, the boundaries of the county imposing the tax and which may include:

(i) highways, roads, streets, bridges, mass transit systems, greenbelts, and other transportation-related projects facilities including, but not limited to, drainage facilities relating to the highways, roads, streets, bridges, and other transportation related projects;

S.C.Code Ann. § 4-37-30(A) (Supp.2002). After the County has enacted an ordinance pursuant to this section, and it is submitted to the county election commission, the county election commission is required to conduct a referendum for approval of the optional sales and use tax. S.C.Code Ann. § 4-37-30(A)(2).

In July 2002, the Charleston County Council ("County Council") enacted an ordinance to impose a one-half percent sales and use tax, and submitted it to the Charleston County Election Commission ("County Election Commission"). Upon receipt of the request to hold a referendum on the proposed tax, the County Election Commission noted that the proposed Ballot question and instructions did not appear neutral, and so advised County Council to change them. Initially, County Council agreed to change the language, but subsequently called a special meeting during which they voted to resubmit the original language. Upon receipt of this news, the County Election Commission voted unanimously that the instructions on the Ballot advocating the tax's passage should be eliminated. County Council objected, claiming that the County Election Commission had no authority to alter the language submitted. The State Election Commission agreed, and, as a result, the County Election Commission printed the Ballot for the November 2002 general election as it was originally submitted by County Council.

The Ballot contained the following instructions to the voters:[1]

All qualified electors desiring to vote in favor of the traffic congestion relief, safe roads, and clean water sales tax, for the stated purposes shall vote "YES."

All qualified electors opposed to the traffic congestion relief, safe roads, and clean water sales tax for the stated purposes shall vote "NO."

Apparently at the County Election Commission's request, County Council printed handouts for distribution by poll workers on election day. The Ballot appeared verbatim on one side of the yellow handout, and the projects to be funded by the tax were listed on the opposite side of the handout. There is some confusion concerning who authored the handout, but it appears staff for County Council produced the handout and included the list of projects to be funded by the tax in addition to the Ballot question.

The tax passed by a narrow margin of 865 votes.[2] Petitioner Douan filed a timely protest to the election results on November 13, 2002. In addition, state Representative Wallace Scarborough and numerous other public officials filed a timely protest against the election results. The County Election Commission held a hearing on November 18, 2002, and upheld the election results. Petitioners (both groups) appealed to the State Election Commission. After considering the transcript of the proceeding below, arguments of counsel, and various exhibits, one member of the Commission made a motion to void the results of the election. Two members of the State Election Commission voted to void the results, but the other two members voted to uphold the election. The fifth seat on the Commission was vacant, and the motion to void the election failed for lack of a majority.[3]

---

**1.** *See* Appendix 1 for complete text of the Ballot used within the City of Charleston. The Ballot used in other parts of the County was identical to the Ballot shown here except it did not contain the last item entitled "City of Charleston Referendum." That referendum is not at issue in this appeal.

**2.** In 2000, a referendum on the same tax failed to pass by just over 900 votes.

**3.** Although the protests filed by Douan and Representative Scarborough raised essentially the same issues, the State Election Commission issued

This Court granted certiorari to review the following issues raised in the election protests:

I. Did the County and State Election Commissions err in refusing to void the results of the 2002 Referendum to adopt the Sales and Use Tax in Charleston County?

 A. Did the non-neutral language of the Ballot violate the fundamental integrity of the election?

 B. Did the Handout distributed by the County Election Commission at the polls constitute unlawful campaign literature?

II. Should the County and State Election Commissions have recused themselves from hearing the appeals below?

## Law/Analysis

## I. Election Results

Petitioners argue that the results of the Referendum must be voided because the language of the Ballot violated mandatory statutory requirements and the fundamental integrity of the election, and that the handout constituted campaign literature, distributed in violation of S.C.Code Ann. § 7–25–180 (Supp.2002).

The scope of appellate review of the State Election Commission's order is limited to corrections of errors of law; findings of fact will not be overturned unless wholly unsupported by the evidence. *Fielding v. South Carolina Election Com'n,* 305 S.C. 313, 408 S.E.2d 232 (1991). "The Court will employ every presumption to sustain a contested election and will not set aside an election due to mere irregularities unless the result is changed or rendered doubtful." *George v. Municipal Election Com'n of City of Charleston,* 335 S.C. 182, 186, 516 S.E.2d 206, 208 (1999) (citations omitted). We have consistently recognized that perfect compliance with the numerous statutes regulating elections is unlikely, and have been

---

two separate orders denying the protests of each group. The protests differ only in that Douan sued County Council and the County Election Commission, and Representative Scarborough sued only the County Election Commission.

loathe to nullify an election based on minor violations of technical requirements. *Id.*

This Court will overturn the results of an election, however, when mandatory statutory provisions have been violated and those violations interfere with a full and fair expression of the voter's choice. *Id.* (citing *State ex rel. Parler v. Jennings,* 79 S.C. 414, 60 S.E. 967 (1908); *accord Laney v. Baskin,* 201 S.C. 246, 22 S.E.2d 722 (1942); *Smoak v. Rhodes,* 201 S.C. 237, 22 S.E.2d 685 (1942); *Killingsworth v. State Exec. Comm. Democratic Party,* 125 S.C. 487, 118 S.E. 822 (1921); *State ex rel. Davis v. State Bd. of Canvassers,* 86 S.C. 451, 68 S.E. 676 (1910)). We "may deem such provisions to be mandatory [even] after an election—and thus capable of nullifying the results—when the provisions substantially affect the free and intelligent casting of a vote, the determination of the results, an essential element of the election, or the fundamental integrity of the election." *George,* 335 S.C. at 187, 516 S.E.2d at 208.

In *George,* the Court made it clear that total disregard of a statute cannot be treated as an irregularity, but must be held to be a cause for declaring the election void and illegal. *Id.* In short, this Court " 'will not sanction practices which circumvent the plain purposes of the law and open the door to fraud.' " *Id.* at 187, 516 S.E.2d at 209 (quoting *May v. Wilson,* 199 S.C. 354, 19 S.E.2d 467 (1942)).

## A. Ballot Language

Petitioners argue that the language of the Ballot is not neutral and, in fact, advocates passage of the Referendum. As such, Petitioners argue the ballot language violates the mandate of two statutory sections—S.C.Code Ann. §§ 4–37–30(A)(3) and 7–13–400—and violates the fundamental integrity of the election. We agree.

Section 4–37–30(A)(3) requires that the Ballot question read *substantially* as follows:

"I approve a special sales and use tax in the amount of (fractional amount of one percent) (one percent) to be imposed in (county) for not more than (time) to fund the following project or projects:

Project (1) for _____ $____.

 Yes ____

 No ____

Project (2), etc."

S.C.Code Ann. § 4–37–30(A)(3) (Supp.2002). The language actually placed on the ballot in this case differed from the required language in three ways.

■ First, instead of listing a dollar amount for the cost of each project, the Ballot question adopted by County Council listed the *percentage* of the total amount to be collected that would be allotted to each project. The Ballot question included the total amount to be collected in the first paragraph of the ballot: 1,303,360,000. Second, the two main projects were not numbered (1) and (2) as suggested in § 4–37–30(A)(3), and, instead, were separated into two different paragraphs. The second project's purpose (purchasing and improving parklands and otherwise preserving greenspace)[4] was buried at the end of the paragraph, after all of the benefits of the project were listed. Third, and, most importantly, the title and instructions to the voters appeared to advocate passage of the tax.[5]

In our opinion, the first two differences between the Ballot actually used and the model ballot set forth in section 4–37–30(A)(3) do not require voiding the election results under the prevailing standard. *George* (recognizing that perfect compliance with the numerous statutes regulating elections is unlikely, and that this Court has been loathe to nullify an election based on minor violations of technical requirements). We find the advocacy language within the Ballot, however, to be more troublesome.

---

4. Section 4–37–30(A) includes "greenbelts" as a permissible project for funding through the tax. Greenbelt is not defined in the statute, but is commonly defined as "a belt of parkways or farmlands that encircles a community." The *New Merriam–Webster Dictionary* 328 (1989).

5. The Ballot has a title under the heading "Question 1" that does not even contain the word "tax." The Ballot stated "Question 1: TRAFFIC CONGESTION RELIEF, SAFE ROADS, AND CLEAN WATER FOR CHARLESTON." None of the other questions presented at this election had such a title.

This Court nullified election results because the ballot contained empty promises and misleading language in *Bellamy v. Johnson*, 234 S.C. 172, 107 S.E.2d 33 (1959). In *Bellamy*, the ballot, used in an election to determine whether certain property should be annexed to the municipality, contained a stipulation that if the measure passed, the municipality would exempt parcels of more than 10 acres in the newly annexed area from taxation until the property was sub-divided. *Id.* This Court found the stipulation to be misleading, stating that it was nothing more than an "empty promise," "unfairly calculated to induce favorable votes by freeholders who were residents in the area proposed to be annexed." *Id.* at 175, 107 S.E.2d at 34–35.

"A question should not be submitted in such form as to amount to an argument for its acceptance or rejection." 29 C.J.S. *Elections* § 170 (1965). This common sense proposition was applied by the Appellate Court of Illinois when it nullified the results of a referendum on the issuance of bonds by the city. *O'Beirne v. City of Elgin*, 1914 WL 2613 (Ill.App.1914). In *O'Beirne*, the city council passed an ordinance to issue $162,000 of bonds for an electrical lighting plant and electric street lighting. The ordinance was put before the public on a referendum, and passed on the following ballot:

If you favor Municipal Ownership Vote Yes.

If you oppose Municipal Ownership Vote No.

By making a cross in one square below, thus: (X).

Shall Bonds or obligations of the City of Elgin for the purpose of providing funds for the purposes mentioned in the ordinance printed hereon to the amount of One Hundred and Sixty–Two Thousand Dollars ($162,000) be issued by the City Council of the City of Elgin, Illinois?
Yes \_\_\_\_
No \_\_\_\_

*O'Beirne* at *1. Those protesting the election objected to the characterization of a yes vote as a "vote in favor of municipal ownership" rather than a vote in favor of the bonds at issue. The Illinois court agreed and nullified the election finding that the ballot did not substantially conform to the statute.[6] The

---

6. The relevant Illinois statute provided:

court found that the statute intended for the instructions to aid the voter in understanding the *meaning* of his vote and not the *reason* for it. *Id.* at \*2. The court explained,

> [i]t was not intended that public officers charged with a duty to **impartially** submit a question to the vote of the people should use the ballot as a vehicle for information or argument as to the motives that might influence the voter in making his choice. Such suggestions as were made are open to argument. It was not for the City Council of Elgin to determine that every voter in favor of municipal ownership should vote "Yes." It is quite conceivable that there might be among the voters those who favored municipal ownership but for reasons satisfactory to themselves did not favor the bond issue in question.

*Id.* at \*2 (emphasis added). For these reasons, the court held that the ballot did not substantially conform to the form prescribed by statute, and rendered the election results void. *Id.*

In the present case, the instructions to the voters characterized the tax as the "traffic congestion relief, safe roads, and clean water sales tax." The Petitioners complain that the characterization of the tax in the voter's instructions was so misleading as to warrant nullification of the election results. Under the rule established in *Bellamy* and under the reasoning of *O'Beirne*, we agree. South Carolina Code Ann. § 7–13–400 provides for the form of the ballot when questions are submitted. That section states, in relevant part:

> The form of the ballot in an election on the issuance of bonds or in which any other question or issue is submitted to a vote of the people shall be a statement of the question or questions and shall thereafter have the following words:
>
> In favor of the question or issue (as the case may be)[]
>
> Opposed to the question or issue (as the case may be)[]

---

If a constitutional amendment or other public measure is submitted to a vote, such question shall be printed upon the ballot after the list of candidates, and words calculated to aid the voter in his choice of candidates or to answer any question submitted to vote may be added, such as "Vote for one," "Vote for three," "Yes," "No," and the like.

*Id.* at \*2 (citations omitted).

The voter shall be instructed in substance, if he wishes to vote in favor of the proposition to place a check or cross mark in the square after the words second above written. S.C.Code Ann. § 7–13–400 (1976 & Supp.2002).

■ In our opinion, the Ballot used here does not conform with this statutorily mandated format, and the non-conformance is so substantial that it affects the fundamental integrity of the election. *See George.* The purpose of section 7–13–400 is the same as that of the Illinois statute discussed in *O'Beirne:* to aid the voter in understanding the *meaning* of his vote, not the *reason* for it. *See O'Beirne.* Instead of explaining *how* the voter could vote for or against the sales tax, the instructions to the voters in this case attributed *reasons* to vote in favor of the measure: "traffic congestion relief, safe roads, and clean water." In fact, these were the very same reasons that supporters of the tax espoused in favor of the tax in the weeks preceding election day. Additionally, just as in *O'Beirne,* persons may be in favor of traffic congestion relief and clean water, "but for reasons satisfactory to themselves [do] not favor the [tax] in question." *O'Beirne* at \*2.

Like the ballot in *Bellamy,* the voter instructions here appear calculated to persuade and ultimately mislead voters into voting in favor of the tax by obscuring the fact that a vote for clean water was a vote for increased sales tax. This conclusion is supported by the language of Question 2 on the Ballot. In contrast to the language used on Question 1 of the Ballot, the voter instructions for Question 2 are worded neutrally. The voter instructions for Question 2 stated:

All qualified electors desiring to vote in favor of the issuance of bonds for the stated purposes shall vote "Yes."
and
All qualified electors opposed to the issuance of bonds for the stated purposes shall vote "NO."

*See* Appendix 1. In addition, the Ballot submitted in the 2000 election on the same sales and use tax, which was defeated, was worded more like Question 2 on the 2002 Ballot, in a content-neutral manner.

While we do not fault County Council for advocating the passage of this tax *before* election day, the fundamental integ-

rity of the election process requires that the voters be presented with an objectively phrased choice on election day. Section 7–13–400 sets forth the format to create a neutrally worded Ballot and does not contemplate words of advocacy. Accordingly, we find that the election results in this case must be voided.

## B. Election Day Handout

Petitioners argue that the handout distributed on election day by election officials constitutes unlawful campaign literature, and serves as an additional reason for the election to be voided.[7]

South Carolina Code Ann. § 7–25–180(A) prohibits the distribution of any type of campaign literature within 200 feet of a polling place on election day. S.C.Code Ann. § 7–25–180(A) (Supp.2002). The statute gives law enforcement officers the authority to remove any such material upon the request of the poll manager. *Id.* Section 7–25–180(A) was intended to grant poll managers authority to prevent certain activity by members of the public on election day. In this case, the poll managers themselves distributed the alleged "campaign literature" at the behest of the County Election Commission.[8]

Petitioners also contend that there is no statutory authority for distribution of a supplemental handout except when constitutional amendments are proposed. S.C.Code Ann. §§ 7–13–2110 and –2120 (1976). This Court has recognized that "[t]he only supplemental ballot handout local election officials are explicitly authorized by statute to distribute is an explanation of a proposed constitutional amendment." *Charleston County Sch. Dist. v. Charleston County Elec. Com'n,* 336 S.C. 174, 185, 519 S.E.2d 567, 573 (1999). However, we also recognize that a practice of distributing such handouts for questions other than constitutional amendments has developed over the years. *Id.* at n. 2.

Resolution of the specific question presented to us is unnecessary as we have determined that the election should be

---

7. *See* Appendix 2.

8. The Code does not define "campaign literature" and there is no case law that defines the term.

voided based on the ballot language alone. Because a practice of distribution by county election officials of explanatory handouts for questions other than constitutional amendments has developed, however, we urge the General Assembly to offer local election officials some statutory guidance in this area. It may be that distribution by the election commission of neutral explanatory material will be approved by the General Assembly. Nevertheless, we can find no logical distinction which would allow partisan, campaign literature drafted by a governmental entity to be distributed within 200 feet of a polling place on election day when the same literature distributed by a private party would not be allowed pursuant to § 7-25-180(A). Preserving the fundamental integrity of the election process requires that governmental entities with a position on or stake in an election adhere to the same rules which all private groups with a stake in an election are required to follow on election day.

## III. Recusal of Election Commission

 Petitioners argue that both the County Election Commission and the State Election Commission erred in refusing to recuse themselves from reviewing Petitioners' election protests. We disagree.

 South Carolina Code sections 4-37-30 and 7-17-30 vest the county election commissions with the duty to hold referenda, canvas ballots, and hear election protests. S.C.Code Ann. §§ 4-37-30 and 7-17-20 & -30 (Supp.2002). The County Election Commission is always "involved" in elections as a matter of statutory mandate. Thus, to follow Petitioners' logic would be to vitiate the County Election Commission's duty to hear any county election protests.[9]

---

9. The County and State Election Commissions did not have a stake in this Referendum because their duties are ministerial in nature. "Neither the State Commission nor County Commission has any unilateral authority to shorten or change the wording of a question to fit a particular ballot form. State and County Commission, subject to statutory guidance, control the form of the ballot only as it pertains to physical characteristics of the ballot such as space limitations and the arrangement of names and issues." *Charleston County Sch. Dist.*, 336 S.C. at 184, 519 S.E.2d at 572.

## CONCLUSION

For the foregoing reasons, we **REVERSE** the State Election Commission's order and nullify the results of the 2002 Sales and Use Tax Referendum in Charleston County.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.

616

# APPENDIX 1

**Number 1**

Must Section 16, Article X of the Constitution of this State relating to benefits and funding of public employee pension plans in this State and the equity securities investments allowed for funds of the various state-operated retirement systems be amended so as to delete the restrictions limiting investments in equity securities to those of American-based corporations registered on an American national exchange as provided in the Securities Exchange Act of 1934 or any successor act, or quoted through the National Association of Securities Dealers Automatic Quotations System or similar service?

**Explanation of above:**

Currently, the state constitution provides that state retirement system funds invested in the stock market must be invested only in American companies traded on the American stock exchanges.

A "yes" vote would allow the General Assembly to pass a law allowing additional stock market investments for state retirement system funds.

A "no" vote would maintain the current constitutional limitation on the stock market investments allowed for state retirement system funds.

○ YES
○ NO

**Number 2**

Must Section 11, Article X of the Constitution of this State relating to restrictions on pledging the credit of the State or its political subdivisions for a private purpose and the restrictions on the State or its political subdivisions from becoming a joint owner or stockholder of a business be amended so as to allow a municipality, county, special purpose district, or public service district of this State which provides firefighting service and which administers a separate pension plan for its employees performing this service to invest and reinvest the funds in this pension plan in equity securities traded on a national securities exchange as provided in the Securities Exchange Act of 1934 or a successor act or is equity successor act or to equity securities quoted through the National Association of Securities Dealers Automatic Quotations System or similar service?

**Explanation of above:**

Currently, the state constitution prohibits a separate retirement system for firefighters operated by a local government from investing in the stock market.

A "yes" vote would allow such a separate firefighters' retirement system to invest in the stock market.

A "no" vote would maintain the current constitutional prohibition on stock market investments for a separate firefighters' retirement system operated by a local government.

○ YES
○ NO

## QUESTION 1
### TRAFFIC CONGESTION RELIEF, SAFE ROADS, AND CLEAN WATER FOR CHARLESTON

I approve a special sales and use tax in the amount of one-half (1/2) percent to be imposed in Charleston County for not more than 25 years, or until a total of $1,303,350,000 in resulting revenue has been collected, whichever occurs first. The spending program shall have an administrative cost of no more than five (5) percent, and all spending shall be subject to an annual independent audit to be made available to the public. The sales tax proceeds will fund the following projects for the following purposes:

Improving roads and road safety throughout Charleston County by building, repairing and maintaining highways, streets, bridges, sidewalks, curbs, gutters, drainage systems and other road amenities where required, including, but not limited to, a new Cooper River Bridge; reducing traffic congestion; discouraging over-development; preventing unnecessary highway and road expenses; and improving air quality by funding and improving mass transit projects operated by Charleston County and other governmental entities serving Charleston County, including, but not limited to, the Charleston Area Regional Transportation Authority and Berkeley-Charleston-Dorchester Rural Transportation Management Association (eighty-three percent of total revenue raised).

Protecting farms, farmland, and open space from over-development; safeguarding rivers, creeks, bays, drinking water and groundwater; providing new parks; and improving air quality by purchasing and improving parklands and otherwise preserving greenspace (seventeen percent of total revenue raised).

TOTAL COST OF ALL PROJECTS: $1,303,350,000

Instructions to Voters: All qualified electors desiring to vote in favor of the traffic congestion relief, safe roads, and clean water sales tax for the stated purposes shall vote "YES."

All qualified electors opposed to the traffic congestion relief, safe roads, and clean water sales tax for the stated purposes shall vote "NO."

○ YES
○ NO

## QUESTION 2

I approve the issuance of not exceeding $113,000,000 of general obligation bonds of Charleston County, payable from the sales and use tax described in Question 1 above, maturing over a period not to exceed 25 years, to fund completion of projects from among the categories described in Question 1 above.

Instructions to Voters: All qualified electors desiring to vote in favor of the issuance of bonds for the stated purposes shall vote "YES."

All qualified electors opposed to the issuance of bonds for the stated purposes shall vote "NO."

○ YES
○ NO

### CITY OF CHARLESTON REFERENDUM

Shall the South Carolina Department of Revenue be authorized to issue temporary permits in the City of Charleston for a period not to exceed twenty-four hours to allow the possession, sale and consumption of alcoholic liquors in sealed containers of two ounces or less to bona fide nonprofit organizations and business establishments otherwise authorized to be licensed for sales?

○ YES
○ NO

TURN THE BALLOT OVER TO CONTINUE VOTING

## APPENDIX 2

## Charleston County
## Sales and Use Tax Referendum

QUESTION 1

#### TRAFFIC CONGESTION RELIEF, SAFE ROADS, AND
#### CLEAN WATER FOR CHARLESTON

I approve a special sales and use tax in the amount of one-half (½) percent to be imposed in Charleston County for not more than 25 years, or until a total of $1,303,360,000 in resulting revenue has been collected, whichever occurs first. The spending program shall have an administrative cost of no more than five (5) percent, and all spending shall be subject to an annual independent audit to be made available to the public. The sales tax proceeds will fund the following projects for the following purposes:

Improving roads and road safety throughout Charleston County by building, repairing and maintaining highways, streets, bridges, sidewalks, curbs, gutters, drainage systems and other road amenities where required, including, but not limited to, a new Cooper River Bridge; reducing traffic congestion; discouraging over-development; preventing unnecessary highway and road expenses; and improving air quality by funding and improving mass transit projects operated by Charleston County and other governmental entities serving Charleston County, including, but not limited to, the Charleston Area Regional Transportation Authority and Berkeley-Charleston-Dorchester Rural Transportation Management Association (eighty-three percent of total revenue raised).

Protecting farms, forestland, and open space from over-development; safeguarding rivers, creeks, bays, drinking water and groundwater; providing new parks; and improving air quality by purchasing and improving parklands and otherwise preserving greenspace (seventeen percent of total revenue raised).

_____ YES _____ NO

TOTAL COST OF ALL PROJECTS: $1,303,360,000

Instructions to Voters: All qualifihied electors desiring to vote in favor of the traffic congestion relief, safe roads, and clean water sales tax for the stated purpose shall vote "YES."

 All qualified electors opposed to the traffic congestion relief, safe roads, and clean water sales tax for the stated purposes shall vote "NO."

QUESTION 2

I approve the issuance of not exceeding $113,000,000 of general obligation bonds of Charleston County, payable from the sales and use tax described in Question 1 above, maturing over a period not to exceed 25 years, to fund completion of projects from among the categories described in Question 1 above.

_____ YES _____ NO

Instructions to Voters: All qualified electors desiring to vote in favor of the issuance of bonds for the stated purposes shall vote "YES;" and

 All qualified electors opposed to the issuance of bonds for the stated purposes shall vote "NO."

# Charleston County
# Sales and Use Tax Referendum

## Project Plan

Total revenue = $1,303.26 million (levied until money raised or up to 25 years)
- 83 percent for roads, maintenance/drainage and mass transit = $1.08 billion
 - No more than 18 percent for mass transit.
 - CARTA
 - Replaces lost subsidy from SCANA/federal funds; replace buses
 - RTMA.
 - Provides vehicle replacement costs
- 17 percent for parks and greenspace = $221.5 million
 - PRC to develop annual plan and administer.

## Road List (based on 2002 dollar values)

- Regional Projects = $415.1 million
 - Cooper River Bridge
 - Mark Clark Expressway*
 - Resurfacing countywide secondary roads
 - I-26 improvements between Aviation and Ashley Phosphate
 - Glenn McConnell Parkway to county line*
 - US 17 North/Johnnie Dodds Parkway#
 - US 17 North/I-526 Interchange

 * partial funding - to be matched with federal and/or state funds

- Annual CTC submissions = $75 million
 - Annual consideration of projects needed by:
 - S.C. Department of Transportation, area municipalities and the unincorporated areas of the county

- Local projects = $200.45 million**
 - Bees Ferry Road widening
 - Ben Sawyer Bridge rehabilitation
 - Bowman Road widening
 - Loop interchange Paul Cantrell/I-526
 - New Road - Highway 162/US 17
 - New Road - Ashley Phos./Palmetto Pkwy.#
 - New Road - I-26/Wescott
 - I-26 Interchange - Ashley Phosph./US78
 - Rivers Avenue overpass near Harley
 - IOP Connector widening - US 17/Rifle Range
 - Folly Rd/Maybank intersection redesign#
 - Harborview improvements#
 - Loop interchange James Is. Conn./Folly Rd.#
 - Middle Street road/drainage improvements
 - Traffic circle-Bees Ferry/Glenn McConnell#
 - US 17 access ramp onto US 61#

 **some projects may or may not qualify for federal and/or state matching funds

- Future improvements = $159.45 million
 - Improvements for future projects, underfunded listed projects and projected highway needs

- Contingency projects = $160.45 million
 - Recommended projects which may be completed if funding allows:
 - Bainbridge Drive/I-26 connector
 - Folly Road redesign/improvements
 - Hungryneck Boulevard West – Phase II
 - McLeod/Sanders/Mary Ader extensions
 - SC 7/US 17/SC 61/SC 171 retrofit
 - US 17 North improvements – Phase II
 - SC 41 widening
 - Rivers Avenue widening
 - Wingo Way Connector to Patriots Point
 - Maybank Highway improvements – Johns Island

# Projects that will be paid for through bond money if Question 2 of the referendum also passes.