## 16924

JOE E. BERRY, as candidate for nomination to the office of State Senator for Richland County in the Democratic primary held June 8, 1954, Petitione, v. A. FLETCHER SPIGNER, JR., as candidate for nomination to the office of State Senator for Richland County in the Democratic primary held June 8, 1954; NEVILLE BENNETT, as chairman of S. C. Democratic Executive Committee; J. M. SMITH, as Secretary of S. C. Democratic Executive Committee, and JOHN I. RICE, and J. BRATTON DAVIS, as chairman and secretary, respectively, of Richland County Democratic Executive Committee, Respondents.

(84 S. E. (2d) 381)

*Messrs. Fred D. Townsend, Sam R. Watt,* and *W. Brantley Harvey, for Petitioner,*

*Messrs. Henry H. Edens, Henry Hammer* and *John Grimball,* of Columbia, *for Respondent,*

November 8, 1954.

LEGGE, Justice.

This is a proceeding under a writ of certiorari issued on the petition of Joe E. Berry to review the actions of the Richland County Democratic Executive Committee and the State Democratic Executive Committee denying petitioner's protest of the declared result of a Democratic primary in Richland County wherein A. Fletcher Spigner was declared the nominee of the Democratic party for the office of State Senator for that county.

Following the Democratic primary of June 8, 1954, and pursuant to the rules of the party, the Richland County Democratic Executive Committee met on June 10 and 11, canvassed the vote, and declared the result, with regard to the office of State Senator, as follows: Spigner, 10,367 votes; Berry, 10,353 votes. Mr. Spigner, having thus a majority of fourteen votes, was thereupon declared the nominee of

the party. Thereafter, within the time prescribed by the party rules, Mr. Berry filed with the County Committee his petition protesting the result so declared and praying that the votes cast in the Olympia precinct be disallowed because of certain alleged unlawful and irregular acts permitted and participated in by the managers of election in that precinct. The protest was considered at a meeting of the County Committee on June 16, 1954, both Mr. Berry and Mr. Spigner being represented by counsel. In support of the protest, petitioner presented several affidavits, to which we shall later refer in detail. After consideration of these affidavits, the County Committee, on motion of counsel for Mr. Spigner, disallowed the protest and reaffirmed its previous action in declaring Mr. Spigner the nominee. Thereafter, on July 23, 1954, petitioner served and filed with the State Democratic Executive Committee his appeal from the action of the County Committee; and the matter was heard by the State Committee on August 18, 1954. To his return to the appeal before the State Committee, Mr. Spigner attached numerous affidavits, but these were not considered by the State Committee, nor have they been considered by this court. The State Committee heard the appeal upon the record as certified to it by the County Committee and thereupon sustained the action of the County Committee. On August 28. 1954, petitioner applied for and obtained a writ of certiorari for the review by this court of the action of the State Committee, and the matter was heard by this court on October 11, 1954.

Respondent's motion to dismiss the writ was argued at the hearing of the proceeding on the merits, and taken under advisement. Since he has prevailed on the merits. the motion does not require determination, but we shall discuss it briefly. By it he first contends that the writ should be dismissed under the authority of *Weston v. Williams*, 190 S. C. 112, 2 S. E. (2d) 381, because of petitioner's laches in prosecuting his appeal to the State Committee. We do not agree. No claim of laches was made

before the State Committee, nor is it suggested that there was undue delay in applying for the writ to review the action of the State Committee, as had been the case in *Weston v. Williams, supra*. Also without merit is his contention for dismissal of the writ because it was not issued pursuant to a rule to show cause or upon motion in writing after four days' notice to him. The decision in *Clary v. Harvey*, 176 S. C. 512, 180 S. E. 673, upon which respondent relies, does not support this contention, as that case dealt with a situation wholly different from that with which we are here concerned. The procedure followed here, whereby the writ is issued *ex parte* by one of the Justices and the hearing on the merits made returnable before the full court, is customary in cases such as the present. *Weston v. Williams, supra; Laney v. Baskin*, 201 S. C. 246, 22 S. E. (2d) 722.

Voting in the Olympia precinct was by voting machine, and the total number of votes cast was 583, of which Mr. Berry received 177 and Mr. Spigner 406. The substance of the affidavits offered before the County Committee in support of the protest was as follows:

1. One affiant said that he saw two of the managers "on at least 75 or 100 instances" go into the voting machine booths with voters who had signed the poll list and did not appear to be physically disabled, and remain there while the voter voted; and that he did not see any model voting machine such as is usually used for instructional purposes.

2. Another said that he saw a manager hand marked ballots to "4 or 5 people".

3. Another said that he saw a manager go into the voting machine booths with "at least half of the voters", and "with nearly every person who entered the center voting machine booth".

4. Another said that he saw "at least 50 or 75 people, who apparently had no disability which would render them unable to prepare their ballot or vote, go into the voting room, sign the poll list, and in turn walk over to the voting booth, whereupon Manager Shorty Gamble, Manager Bill

Kirkland or someone else sometimes said something to the voter, accompanied the voter into the voting machine booth and remained with the voter during the entire time that the voter cast his ballot".

5. Another said that he saw a manager go into the voting machine booth "with two of the voters who were in the line to my left and with the man who was in front of me".

6. Another said that he saw a manager go into the voting booth "with at least six people, and remain with each of them while he or she voted".

7. Another said that he heard a woman say "I do not know who to vote for", whereupon "one of the managers whose name I do not know" told her "the names of several people whom he wished her to vote for".

8. Another said that he saw "at least 20 or 25 instances in which the managers entered into the voting machine booth with the voter and remained with him or her while he or she voted. These voters signed the polling list, and appeared to have no disability whatsoever except for one man who was partially blind".

9. Several affiants stated that the model voting machine was not conspicuously located.

10. One affiant, Clarence Coward, said that he "went into the voting machine and Bill Kirkland went in with me and I told Bill I wanted to vote for Joe Berry. Bill reached up and pulled down the voting pointers but he didn't pull down the pointer over Joe Berry and I noticed that but before I could do anything about it he pulled the big lever and the curtain opened".

11. One affiant, Sally Dunaway, said that one of the managers went into the voting machine booth with her, pointed out several names on the voting machine, and said, "If you have not made up your mind, these are good ones to vote for". Affiant replied that she had the names of her candidates listed on a dummy ballot, and that she didn't need his help as to whom to vote for. The affidavit proceeds:

"All I need you to do is show me how to operate the voting machine. I pulled down the pointer over a candidate for Governor and asked him if that was the way to operate the pointer and he said it was. So I proceeded to pull down the pointers for the other candidates and pulled the lever that tallies the votes and opens the curtain. I did not see a demonstration model machine while I was in the room. In fact I did not know there was supposed to be one displayed. Shorty Gambrell showed me or instructed me on the real voting machine and remained in the voting machine all the time while I voted".

Review by this court, on *certiorari,* of the action of the State Democratic Executive Committee is confined to the correction of errors of law, and does not extend to consideration of the facts upon which that committee acted, except to ascertain whether the action of the committee was wholly unsupported by evidence. *Young v. Sapp,* 167 S. C. 364, 166 S. E. 354; *May v. Wilson,* 199 S. C. 354, 19 S. E. (2d) 467; *Smoak v. Rhodes,* 201 S. C. 237, 22 S. E. (2d) 685; *Laney v. Baskin,* 201 S. C. 246, 22 S. E. (2d) 722.

Applying the same principle to a situation like the present one, where the County Committee disallowed the protest for insufficiency without requiring evidence on the part of respondent and the State Committee likewise required no evidence on the part of respondent, basing its affirmance of the action of the County Committee upon the record as transmitted by that committee, this court will not disturb the result on factual grounds unless it appear that the evidence on the part of the petitioner before the County Committee was susceptible of no reasonable inference other than that the irregularities and unlawful acts complained of affected, or at least cast doubt upon, the result of the election.

Errors which do not appear to have affected the result will not be allowed to overturn an election, and every reasonable presumption will be indulged to sus-

190

tain it. *Hyde v. Logan,* 113 S. C. 64, 101 S. E. 41; *Corn v. Blackwell,* 191 S. C. 183, 4 S. E. (2d) 254; *Jenkins v. McCarey,* 222 S. C. 426, 73 S. E. (2d) 446.

"The misconduct of election officers or irregularities on their part will not justify rejecting the whole vote of a precinct where it does not appear that the result was affected thereby, even though the circumstances may be such as to subject the officers to punishment * * *. Voters who have done all in their power to cast their ballots honestly and intelligently are not to be disfranchised because of an irregularity, mistake, error, or even wrongful act, of the officers charged with the duty of conducting the election, which does not prevent a fair election and in some way affect the result." 29 C. J. S., Elections, § 214, pp. 308, 309; *Cf. Smith v. Saye,* 130 S. C. 20, 125 S. E. 269.

Much of the complaint concerning the conduct of the election in the Olympia precinct centers about the alleged actions of two of the managers in accompanying able-bodied voters into the voting machine booths and remaining there while the voter voted. Section 23-423 of the 1952 Code reads as follows:

"In case any voter, after entering the voting machine, shall ask for further instructions concerning the manner of voting, two of the managers shall give such instructions to him, but no manager or other election officer shall in any manner request or seek to persuade or induce any such voter to vote any particular ticket or for or against any particular candidate or for or against any particular amendment, question or proposition. After giving such instructions the managers shall, before the voter has voted, retire and such voter shall cast his ballot in secret."

By the oath required under both the rules of the Democratic Party of South Carolina (Rule 24) and Section 23-378 of the 1952 Code to be taken and signed before the opening of the polls, the managers solemnly swear, among other things, that they "will not unlawfull assist any voter

to prepare his ballot and will not advise any voter as to how he should vote at this election."

Conduct on the part of a manager of election such as is alleged in several of the affidavits before the County Committee would be not merely improper or reprehensible; it would be in direct violation of the statute law before quoted, and would constitute an offense for which the manager would be subject to criminal prosecution. A manager of election, perhaps more directly and immediately than any other election official, is charged with the honest and lawful conduct of the election. He is supposed to know the laws and rules in that regard, for he takes a solemn and specific oath to obey them and to see that the voters obey them. It is to him that the voter at the polls must look for guidance. Deliberately improper conduct on his part cannot be too strongly condemned.

A primary election being part of a process by which a political party selects its nominees for the general election, determination of contests between candidates in the primary is essentially and fundamentally a party matter, to be resolved by the tribunals created by and within the party for that purpose. It is their function to weigh the evidence presented in respect of the contest, to determine, as would a jury, the credence to be accorded the testimony of each witness, and to evaluate the effect of the irregularities or illegalities thus disclosed upon the result of the election; and their conclusions are reviewable by the courts only to the limited extent before stated.

In the present case it is noteworthy that not a single vote was challenged; that the eleven affiants whose testimony was presented in support of the protest included only five of the five hundred eighty-three persons who voted in the Olympia precinct; that of those five only two, Clarence Coward and Sally Dunaway, testified to irregularity or illegal conduct directed toward their own voting; and that Sally Dunaway's testimony was to the effect that although a manager remained with her in the voting ma-

chine she voted for the candidates of her choice. Only Clarence Coward testified that he was deprived of the freedom of his vote by the action of Manager Kirkland in pulling the lever of the voting machine; and it is remarkable that this witness voiced no protest at the time. It is noted, too, that the charges that the managers sought to influence votes by handing marked ballots to "four or five people", and that they illegally entered the voting machines in "at least 75 or 100 instances", and "with at least half of the voters", and "with nearly every person who entered the center voting machine booth", etc., are laid in most general terms, and that not one of the voters referred to is mentioned by name. Both the County Committee and the State Committee held that the showing thus made in support of the protest was insufficient. In view of the indefiniteness of the evidence, we cannot say that their action was unwarranted.

After the hearing before us, the time for the holding of the general election being close at hand, this court, by an Order dated October 13, 1954, announced its decision and stated that an opinion would be later filed. That order operated as a final determination of the case, and by it the return to the writ was found to be sufficient, the writ was discharged, and the temporary injunctions theretofore issued were dissolved.

STUKES, TAYLOR and OXNER, JJ., and G. BADGER BAKER, A. A. J., concur.