23443

Bernard FIELDING, Petitioner v. SOUTH CAROLINA ELECTION COMMISSION, The South Carolina Board of State Canvassers, The Charleston County Election Commission, The Charleston County Board of Canvassers, and Chris Merrill, Respondents.

(408 S.E. (2d) 232)

Supreme Court

*Lucas C. Padgett, Jr.,* of *McNair Law Firm, P.A., Daniel E. Martin, Jr.,* and *Armand Derfner,* Charleston, *for petitioner.*

*David C. Eckstrom,* of *Nexsen, Pruett, Jacobs & Pollard,* and *Asst. Atty. Gen. Treva G. Ashworth,* Columbia, *for respondents South Carolina Election Com'n* and *South Carolina Bd. of State Canvassers.*

*Joseph S. Mendelsohn,* Charleston, *for respondents Charleston County Election Com'n* and *Charleston County Bd. of Canvassers.*

*W. Robert Kinard,* North Charleston, and *Pamela J. Polzin,* Charleston, *for respondent Chris Merrill.*

Heard June 13, 1991.

Decided July 23, 1991.

CHANDLER, Justice:

From an order of the South Carolina Board of State Canvassers (State Board) overturning a probate judge election in Charleston County, we granted certiorari. We reverse.

## FACTS

In the election for the office of Charleston County probate judge Petitioner Bernard Fielding (Fielding), the Democratic party candidate, received 29,492 votes; his opponent, Respondent Chris Merrill (Merrill), the Republican party candidate, received 29,038 votes. From a protest by Merrill, the Charleston County Board of Canvassers (County Board) conducted a full evidentiary hearing, after which it upheld the election.

Thereupon, Merrill filed a protest with the State Board, alleging voting irregularities in the McClellanville 2 and Wadmalaw Island precincts. After a hearing, the Board ordered a new election.

The essential evidence of irregularity and impropriety relied upon by the State Board is summarized as follows:

(a) *McClellanville 2*
The testimony of a poll watcher that he witnessed people selling their votes for $2.50 and exchanging this money for brown bags containing "Wild Irish Rose Wine" dispensed by members of the Democratic party.

However, when asked *how many* people he saw selling their votes, the witness merely responded, "as long as you wanted to stand there and watch." He further stated that this practice continued "all day," although he later admitted that he was at the precinct for only twenty to twenty-five minutes. Despite his accusations of such eregious conduct, he did nothing to curb it; finally, he made no challenges to the allegedly tainted votes, although he acknowledged he had the authority and ability to do so. It is noted, and significant, that there were no corroborating witnesses to these alleged violations. Indeed, another poll watcher at McClellanville 2 adamantly disputed these charges, testifying that he did not know or see anything relating to vote-buying.

(b) *Wadmalaw Island*

(i) The testimony of a poll watcher that "probably ninety percent of all the black people received assistance," whereas "maybe twenty to twenty-five percent" really required assistance.[1] When this witness was queried as to how she knew a voter did not need assistance, she replied, "[w]ell, when you have a big strapping 20-year-old boy in a sweatsuit who says he needs help . . . I question that." This witness conceded she should have challenged the votes she believed to be illegal, but failed to do so, and when asked for a specific number of votes affected, she replied, "I can only *guess*," and "I'm not *clairvoyant*." (Emphasis supplied.)

(ii) The testimony of a poll manager estimating that approximately seventy-five percent of the voters received assistance, although only twenty percent actually needed it. However, this witness could not explain how she determined a voter's need for assistance or the actual number of votes so affected, stating, "I can't tell you they were all irregular, I can't, because I don't know that."

(iii) The testimony of another poll manager that "a very large percentage" of voters received illegal assistance. The rationale for her conclusion was "a great many of them were young people that I can't see any reason why they needed assistance." Notwithstanding her belief the assistance was illegal, the poll manager failed to challenge a single vote and signed the "Poll Manager's Oath" at the end of the election, certifying that she conducted the election in a lawful manner.

Throughout the entire election *no* documentation of the above allegations was obtained or preserved for appellate review and, likewise, *no* challenges were made to any votes at either the McClellanville 2 or Wadmalaw Island precincts.

## ISSUES

1. Was the evidence relied upon by the State Board sufficient to overturn the election?

---

[1] "Only those persons who are unable to read or write or who are physically unable to incapacitated from preparing a ballot or voting shall be entitled to receive assistance of any kind in voting." S.C. Code Ann. § 7-13-780 (1976).

2. When must challenges to voting irregularities be made?

## DISCUSSION

### I. *Sufficiency of Evidence*

The scope of appellate review of the State Board's order "is limited to corrections of errors of law; findings of fact will not be overturned unless wholly unsupported by the evidence." *Knight v. State Board of Canvassers,* 297 S.C. 55, 57, 374 S.E. (2d) 685 (1988); *Simms v. Hamm,* 275 S.C. 369, 271 S.E. (2d) 316 (1980); *Berry v. Spigner,* 226 S.C. 183, 84 S.E. (2d) 381 (1954). Every reasonable presumption in favor of sustaining a contested election will be employed and irregularities or illegalities which do not appear to have affected the result of the election will not be allowed to overturn it. *Id.* In *Berry, supra,* this Court found that *general* allegations of illegal activity will not support the burden of establishing that the irregularity flawed the election.

Averting to the record here, it is patently clear that the evidence relied upon by the State Board falls far short of that required for the invalidation of an election. Viewing it in the light most favorable to candidate Merrill, the evidence rises, at best, to the level of conjecture, speculation, and surmise: no poll manager or poll watcher who testified could identify a definitive number of alleged illegal votes cast; the testimony concerning vote-buying was totally without substantiation as to either the giver or receiver of the monies; the testimony concerning illegal assistance was based upon the subjective opinion of the poll watcher; and, finally, no documentation whatsoever of any of the alleged irregularities was presented, only the uncorroborated opinions of individuals.

### II. *Challenges*

S.C. Code Ann. § 7-13-810 (Supp. 1990) which establishes the procedure for challenging votes, provides that any elector, watcher, or manager may challenge the vote of any person suspected of not being a qualified voter. Although this must be done *before* the person is handed the ballot or enters the voting machine, the statute further provides that votes may be challenged based on evidence discovered *after* the vote is cast. *See Hill v. South Carolina Election Comm'n,* — S.C. —, 403 S.E. (2d) 309 (1991).

■ Moreover, the Poll Manager's Handbook for Conduct of General Elections[2] sets out the procedure by which poll managers lodge a vote challenge based upon illegal assistance.

Merrill complains that egregious vote-buying occurred at McClellanville 2 precinct; however, not a single challenge was made to any vote allegedly bought or sold. When asked why challenge was not made, the poll watcher testified "if you challenged every ballot, every questionable ballot in McClellanville 2, the election would last a week."

As to the charges of illegal voter assistance at Wadmalaw Island precinct, again no challenges were made. The poll manager testified she failed to follow the procedure for challenge because "[w]e would have never voted everyone that day."

It is noted that those responsible for making appropriate challenges at both precincts assign excessive time consumption as the reason for failing to do so.

Nothing in the case law of this Court, in statutory law, or in the Poll Managers Handbook holds that a slowdown in the electoral process brings about a waiver of the requirement to challenge. To the contrary, the making of a challenge is essential to the preservation of an adequate record upon which appellate review can be had.

## CONCLUSION

While corruption-free elections are imperative to the very survival of the republic, it is equally essential that, where corruption is charged, a documented record be established upon which alleged wrongdoing may receive appellate review. As indicated earlier, the record before us is comprised only of conjecture, speculation, and surmise; it clearly does not sustain the burden enunciated in *Berry* that "every reasonable presumption will be indulged to sustain [the election]." *See Berry, supra,* 226 S.C. at 189, 84 S.E. (2d) at 384. Indeed, the evidence here is strikingly similar to that rejected by the Court in *Berry,* as "laid in most general terms." *Berry,* 226 S.C. at 192, 84 S.E. (2d) at 385.

---

[2] The Poll Manager's Handbook is prepared and distributed by the State Election Commission. It was submitted to the Court, without objection, during oral argument.

Accordingly, the order of the State Board is reversed, and the decision of the County Board, upholding the election, is reinstated.

Reversed

GREGORY, C.J., and HARWELL, FINNEY and TOAL, JJ., concur.