674 S.E.2d 154

Russell LAFFITTE, as Personal Representative of the
Estate of Angela Lynn Plyler, Respondent,

v.

BRIDGESTONE CORPORATION, Bridgestone/Firestone North
American Tire, LLC, Ford Motor Company, Bubba Windham
and Chuck Horton d/b/a Vintage Motors, Defendants,

of whom Bridgestone Corporation is the Petitioner.

Russell Laffitte, as Personal Representative of
the Estate of Justin Plyler, Respondent,

v.

Bridgestone Corporation, Bridgestone/Firestone North American
Tire, LLC, Ford Motor Company, Bubba Windham and
Chuck Horton d/b/a Vintage Motors, Defendants;

of whom Bridgestone Corporation is the Petitioner.

Alania Plyler, a minor by and through her Conservator,
Russell Laffitte, Respondent,

v.

Bridgestone Corporation, Bridgestone/Firestone North American
Tire, LLC, Ford Motor Company, Bubba Windham and
Chuck Horton d/b/a Vintage Motors, Defendants,

of whom Bridgestone Corporation is the Petitioner.

Hannah Plyler, a minor by and through her Conservator,
Russell Laffitte, Respondent,

v.

Bridgestone Corporation, Bridgestone/Firestone North American
Tire, LLC, Ford Motor Company, Bubba Windham and
Chuck Horton d/b/a Vintage Motors, Defendants,

of whom Bridgestone Corporation is the Petitioner.

No. 26606.

Supreme Court of South Carolina.

Re-heard Sept. 17, 2008.

Decided March 2, 2009.

462

M. Dawes Cooke, Jr., Todd M. Musheff, and John W. Fletcher, all of Barnwell Whaley Patterson & Helms, of Charleston, and Wallace K. Lightsey, of Wyche Burgess Freeman & Parham, of Greenville, for Petitioner.

F. Arnold Beacham, Jr., of Young & Sullivan, of Lexington, and John E. Parker, Ronnie L. Crosby, and R. Alexander Murdaugh, all of Peters, Murdaugh, Parker, Eltzroth & Detrick, of Hampton, for Respondents.

Elbert S. Dorn and Nicholas W. Gladd, both of Turner Padget Graham & Laney, of Columbia,. for Defendant Ford Motor Company, Erin D. Dean, of Tupper Grimsley & Dean, of Beaufort, for Defendant Bubba Windham et al., and Henry B. Smythe, Jr., David B. McCormack, and David S. Cox, all of Buist Moore Smythe McGee, of Charleston, for Defendant Bridgestone/Firestone North American Tire.

E. Warren Moise, of Grimball & Cabaniss, of Charleston, and Debora B. Alsup, of Thompson & Knight, of Austin, Texas, for Amicus Curiae Rubber Manufacturers Association.

John G. Creech, James H. Fowles III, and C. Victor Pyle III, all of Ogletree Deakins Nash Smoak & Stewart, of Columbia, for Amicus Curiae South Carolina Chamber of Commerce.

C. Mitchell Brown, William C. Wood, Jr., and A. Mattison Bogan, all of Nelson Mullins Riley & Scarborough, of Columbia, for Amicus Curiae Product Liability Advisory Council, Inc.

## ORIGINAL JURISDICTION

Chief Justice TOAL:

In this product liability case, we granted a petition for a writ of certiorari in our original jurisdiction to review the trial court's discovery order compelling Petitioner Bridgestone Corporation (Bridgestone) to turn over its steel belt skim stock formula, classified as a trade secret, to Respondent Russell Laffitte. For the reasons detailed below, we find that Respondent has not shown that knowledge of Bridgestone's trade secret is necessary in order for Respondent to litigate this product liability action. Consequently, the trial court's order compelling disclosure by Bridgestone of the skim stock formula is reversed.

### FACTUAL/PROCEDURAL BACKGROUND

On July 16, 2005, Angela Plyler was driving her 1999 Ford Explorer along Interstate 95 in Hampton County with her three children as passengers. The tread from the left rear tire of the Explorer separated from the tire, allegedly causing the vehicle to overturn and collide with a tree. The single-car accident killed Angela and her teenage son Justin, and seriously injured her daughters Alania and Hannah.

Respondent, acting as personal representative for the decedents and as conservator for the minor daughters, filed four separate lawsuits against several defendants, including Bridgestone, the manufacturer of the vehicle's left rear tire. The complaints allege negligence, warranty, and strict liability

claims against Bridgestone. As to the negligence allegations, Respondent maintains Bridgestone used an inadequate tire design and failed to use proper manufacturing techniques resulting in a defective tire. In addition, Respondent specifically alleges Bridgestone failed to use sufficient antidegradants to protect the integrity of the tire.

The four cases were consolidated for discovery purposes. Respondent sought to obtain information on the design and manufacturing processes for the subject tire, which had been manufactured in 1996 at Bridgestone's Hofu Plant in Japan.[1] Bridgestone objected to Respondent's requests for its steel belt skim stock formula[2] and other related information on the basis that the skim stock formula was a trade secret of Bridgestone.[3] According to Bridgestone, Respondent can prove his claims without discovery of the skim stock formula because he has access to the actual failed tire and can therefore conduct appropriate testing on the tire itself. Respondent counters that without the information related to the skim

---

1. The subject tire is a P235/75R15 Radial ATX steel belted radial passenger tire and was designed for use as a replacement tire. At the time of the accident, the subject tire was being used as a spare and was the only Bridgestone tire on the Explorer; Michelen manufactured the other three tires.

2. According to Bridgestone's expert witness, steel belt skim stock is "a specifically formulated rubber compound calendered onto the steel cord to form the steel belts in a steel belted radial passenger or light truck tire," which is "formulated to provide, among other things, adhesion between the rubber and steel cord, and between the belts and surrounding components." The formula of a rubber compound such as the steel belt skim stock "typically contains the chemicals or ingredients used in the compound; the quantities or relative percentages of those ingredients; and the manner in which those ingredients are processed to form the compound and give it the desired physical properties after it is vulcanized, or cured."

3. Respondent has not disputed that the skim stock formula is a trade secret. Under South Carolina law, a trade secret is defined as information, including a formula or process, that:
 (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other person who can obtain economic value from its disclosure or use, and
 (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
 S.C.Code Ann. § 39–8–20(5)(a) (Supp.2007).

stock ingredients and manufacturing processes, including any plant-specific deviations from the manufacturing formula, the defect claims cannot be proven.

The trial court held a hearing in January 2007 on Respondent's motion to compel and Bridgestone's cross-motion for a protective order. The trial court informed counsel in February 2007 that it would be granting the motion to compel. Prior to entry of the final order, however, the trial court granted Bridgestone's request that it be allowed to depose Respondent's experts solely on the issue of Respondent's need for the skim stock formula. Four experts provided affidavit or deposition testimony on the issue of Respondent's need for the skim stock formula.

Bridgestone's expert, Brian Queiser, described the various factors beyond the tire's chemical composition which could affect the tire's durability.[4] According to Queiser's affidavit:

A tire is a highly engineered, complex product, which is the result of a blend of chemistry and engineering. A steel belted radial passenger tire typically contains twenty or more components and more than a dozen different rubber compounds....

... Furthermore, the individual components of a steel belted radial tire are designed to work in conjunction with the other components of that tire. As a result, the forces exerted on the tire during its operation are subject to the combined effects of many parameters, including tire size; inflation pressure; component materials, dimensions, and gauge; as well as vehicle characteristics. Therefore, it is not accurate to gauge the performance of any particular tire by focusing on one isolated component or compound.

 . . . .

... Given the inherent design of any steel belted radial tire, ... the areas of the steel belt edges are generally the areas of highest stress/strain. As a result, any steel belted radial

---

4. Queiser, an employee of Bridgestone/Firestone, Inc. since 1994, holds a bachelor's degree in aeronautical and astronautical engineering as well as a master's degree in engineering mechanics. He stated that he has "personally developed steel belted radial tires from concept through ... production" and that his experience included analysis of tire failure.

tire can sustain a tread/belt separation due to numerous service conditions such as overloading, underinflation, punctures, road hazards, impact damage and so forth.

Queiser further explained that rubber compound formulas cannot be reverse engineered from the finished product because once a tire is cured, the chemical composition changes. Queiser asserted that because the physical properties of the subject tire itself could be inspected and tested, "[a]ccess to the formulas is unnecessary to determine whether the tire was properly designed and manufactured." As to the trade secret nature of the skim stock formula, Queiser described the formula as "one of Bridgestone/Firestone's most valuable assets and most closely guarded secrets."

At his deposition, when asked why the skim stock formula was unnecessary in the instant litigation, Queiser responded as follows:

Well, I guess in this case, as I understand it, all that you would need is what you essentially have. You have the tire, you have the ability to test the tire, test its physical properties. It has been my experience that that is all you need to evaluate the condition of the tire as it relates to its performance. It is my experience that the ability to have the chemical information, the recipe, really doesn't answer those questions for you. The formula or recipe doesn't give you the performance, frankly, which is the most important element.

Queiser elaborated that when the federal government investigated certain tires manufactured by Bridgestone/Firestone, Inc., which were similar to tires recalled by Firestone in August 2000, "[f]ormula was not part of the report ..., it was all about the performance, the design of the tire from a mechanical and structural perspective and the performance of that tire. It was not about the chemical constituents or the recipe." When pressed by Respondent's counsel as to whether the skim compound or manufacturing process was ever considered as part of the federal investigation, Queiser answered as follows:

No, I would not say "never considered." But certainly it was something that was clearly early set aside as a probable cause. We had so many tires produced from so many

different plants with that same formula, hundreds of which ... had absolutely no claim or lawsuit associated with them on that same compound. That formula or compound, per se, no, it wasn't a factor early on.

Queiser also described how rubber changes over time from exposure to oxygen and ozone, noting that "[t]he environment, the use of the tire or the rubber, how the rubber is used, [and] other external influences naturally are a part of its properties over time." Queiser acknowledged that oxidation in general would cause changes in the makeup of a rubber compound, but qualified his statement saying that chemical changes in rubber compounds, in his opinion, were still not fully understood by modern science. Queiser also acknowledged that antidegradants are added to the skim stock compound to combat the effects of oxygen on a tire and that there were "other inherent qualities" of other ingredients in the tire which "may also lend themselves to some resistance to change." Queiser nonetheless adhered to his view that by physically testing the subject tire—perhaps by viewing it at a microscopic level—would be the appropriate way to assess whether there is a design defect.

Finally, Queiser testified that the skim stock compound chemically interfaces with the brass which covers the steel belts, and that this "is one of the essences of the trade secret nature of the chemical composition and the production of that compound." If a competitor were to have knowledge on this aspect of tire design, Queiser stated that the competitor would essentially acquire "a company's decades' worth of experience" which would give it "a huge competitive advantage."

Respondent presented three experts to opine on the need for the skim stock formula in support of the motion to compel. Robert C. Ochs stated in an affidavit that he had evaluated the subject tire to determine why the tire failed.[5] Ochs averred as follows:

My initial evaluation of the tire reveals that the tire failed prematurely as a result of a defect in the tire. At this time

**5.** Ochs holds a bachelor's degree and a master's degree in mechanical engineering. Michelin employed Ochs from 1969–1994, during which time his work included analysis of failed passenger and light truck tires.

I cannot state whether the defect is in the manufacture or design of the tire.

[Respondent has] requested that I work together with James E. Duddey, Ph.D. and Richard J. Smythe, Ph.D. to determine if the failure was the result of a manufacturing defect or a design defect. In order to perform the specific work requested by [Respondent] it will be necessary to compare the failed tire with its initial physical properties as designed by Bridgestone.

Because this failure involves a separation of the tread belt, it will be necessary to examine the skim compound formula to aid in determining the true nature of the defect. Once the skim compound used to manufacture the subject tire is analyzed, both for its intended physical properties and as compared to the central compound formula, I will then be able to render opinions on the true nature of the defect.

Respondent's second expert, Dr. James Duddey inspected the failed tire and made the following observations in his affidavit: [6]

Examination of the tire demonstrates a premature failure caused by the separation of the steel belts. The tire shows evidence of surface cracking that could be caused by fatigue or premature rubber aging. The tire tread piece examined demonstrates a degree of hardness in the skim stock that may be related to either the initial physical properties of the rubber compound or premature aging.

Additionally, because Respondent's counsel specifically requested that Duddey review the skim stock formula to determine whether a design defect existed in the subject tire, and whether changes made to the antidegradant package used in the skim stock formula affected the aging mechanical properties of the tire, Duddey stated that he needed "access to documents showing the initial physical properties of the rubber compound to determine whether there exists a plant specific manufacturing issue or an overall design issue."

At his deposition, Duddey acknowledged that a number of factors, such as overload and underinflation, could cause belt separation in tires that were properly designed. Duddey also

---

6. Duddey holds a Ph.D. in physical organic chemistry and worked for Goodyear Tire and Rubber Company for thirty-two years.

explained that there were multiple possible causes for the increased hardness found in the subject tire, including oxidative aging and heat exposure.

As to needing the skim stock formula in order to determine why the subject tire exhibited hardness, Duddey testified that "as a starter you need to know what the properties were as the tire was designed and manufactured and then you need to try to make some judgment as to if it's significantly different than when it was manufactured, how it got to that point." Duddey admitted, however, that both the hardness and the cracking found in the subject tire did not necessarily relate back to the formulation of the compound, but could also have been associated with how the tire had been used. Duddey explained that if Bridgestone provided the skim stock formula for the subject tire, ultimately all he could do was make a comparison as to "what is the general practice that is out there in the supplier literature and the technical literature."

Respondent's third expert, Dr. Richard Smythe, was hired to analyze certain materials within the tire deemed important by experts Ochs or Duddey.[7] Smythe indicated that he would design an analytical protocol in order to evaluate certain aspects of the skim stock formula and that if Ochs and Duddey determined that the subject tire did not exhibit the physical properties intended by its design, he would be able to assist in a root-cause analysis of why that tire failed. Smythe asserted that it was "absolutely necessary" that he know all of the ingredients in the rubber compound in order to render his expert opinion in the matter.

After considering the experts' depositions and the parties' supplemental briefs, the trial court issued an order compelling discovery and issued a restrictive protective order.[8] Specifi-

---

7. Smythe, an analytical chemist, has been exposed to at least one proprietary skim stock formula and has performed work on rubber compounds to determine why they failed. Smythe is not a tire engineer and does not claim to have expertise in tire design or manufacturing.

8. The trial court found that a protective order could be fashioned to protect the trade secret status of the information, but "[b]ecause the parties are in a better position to narrow the issues on the terms of a protective order," the trial court instructed the parties to collaborate on the specific terms of the protective order. There is no protective order

cally, the trial court found that Respondent had met the prerequisites for discovery of trade secret information under either Rule 26(c), SCRCP, or the South Carolina Trade Secrets Act, S.C.Code Ann. § 39–8–10 *et seq.* (Supp.2007) (hereinafter "Trade Secrets Act"). The trial court concluded that Respondent's experts had established the need for the skim stock formula, stating as follows:

> [Respondent's] claim [is] that the failed tire experienced a steel belt separation. It further appears it is the skim stock compound that is designed to provide adhesion between the steel belts and between surrounding components. As such, the composition of the ingredients, both actual and intended, and the method by which the rubber compound was made is relevant to the inquiry into why the subject tire failed. While it may be possible, it appears unlikely that [Respondent] could seriously pursue a design defect theory without access to the materials and methods used to manufacture the portion of the tire claimed to be responsible for the failure.

Bridgestone thereafter petitioned for certiorari review of the trial court's order in this Court's original jurisdiction. The Court granted the petition and Bridgestone raises the following issues for review:

I. What is the appropriate standard for the discovery of trade secret information in a product liability action?

II. Did the trial court err in finding that Respondent established the requisite need for Bridgestone's trade secret skim stock formula?

### STANDARD OF REVIEW

██ Ordinarily, an order compelling discovery is not directly appealable. *Lowndes Products, Inc. v. Brower,* 262 S.C. 431, 205 S.E.2d 184 (1974). Nevertheless, a writ of certiorari may be issued when exceptional circumstances exist. *See In re Breast Implant Product Liability Litigation,* 331 S.C. 540, 503 S.E.2d 445 (1998). The instant case presents such exceptional circumstances as it involves a novel question

---

in the record presumably because Bridgestone filed its petition for a writ of certiorari less than a month after the trial court's order.

of law in a matter that has been the subject of numerous claims in state and federal courts. A decision by this Court at this time best serves the interests of judicial economy by eliminating the numerous inevitable appeals raising this novel issue of significant public interest. *Id.* n. 2.

██ On certiorari, review by the Court is confined to the correction of errors of law. *Berry v. Spigner*, 226 S.C. 183, 84 S.E.2d 381 (1954).

## LAW/ANALYSIS

We begin our analysis by putting the legal nature of a trade secret into context. As aptly described in a recent opinion by the Indiana Supreme Court:

> Trade secrets are unique creatures of the law, not property in the ordinary sense, but historically receiving protection as such. Unlike other assets, the value of a trade secret hinges on its secrecy. As more people or organizations learn the secret, the value quickly diminishes. For this reason, owners or inventors go to great lengths to protect their trade secrets from dissemination.

> The value of trade secret protection to a healthy economy has been widely accepted for some time. Over the last two hundred years, the law has developed mechanisms for accomplishing this end.

*Bridgestone Am. Holding, Inc. v. Mayberry*, 878 N.E.2d 189, 192 (Ind.2007) (footnote omitted).

However, it is also true that "trade secrets may be valuable during the course of litigation not involving misappropriation claims, and there are moments when justice requires disclosure." *Id.* at 193. In spite of this acknowledgement of the potential value of trade secrets in litigation, the *Mayberry* court also cautioned that "courts must proceed with care when supervising the discovery of trade secrets, lest the judiciary be used to achieve misappropriation or mere leverage." *Id.*

## I. Standard for Discovery of Trade Secrets

The question of what standard governs the discovery of trade secret information is a novel issue in South Carolina. Under the Trade Secrets Act, a person "aggrieved by a

misappropriation, wrongful disclosure, or wrongful use of his trade secrets may bring a civil action to recover damages incurred as a result of the wrongful acts." S.C.Code Ann. § 39–8–30(C). The Trade Secrets Act addresses discovery matters and provides in pertinent part as follows:

(A) In an action under this chapter, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding hearings in-camera, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.

(B) In any civil action where discovery is sought of information designated by its holder as a trade secret, before ordering discovery a court shall first determine whether there is a substantial need by the party seeking discovery for the information.

"Substantial need" as used in this section means:

(1) the allegations in the initial pleading setting forth the factual predicate for or against liability have been plead with particularity;

(2) the information sought is directly relevant to the allegations plead with particularity in the initial pleading;

(3) the information is such that the proponent of the discovery will be substantially prejudiced if not permitted access to the information; and

(4) a good faith basis exists for the belief that testimony based on or evidence deriving from the trade secret information will be admissible at trial.

S.C.Code Ann. § 39–8–60. Although Respondent suggests that the Trade Secrets Act only applies to those actions alleging trade secret misappropriation,[9] we find that the plain

9. In support of his position, Respondent asserts *Griego v. Ford Motor Co.*, 19 F.Supp.2d 531, 533 (D.S.C.1998), in which the federal district court held that the Trade Secrets Act does not apply to a product liability action because it "is not based on misappropriation of a trade secret or protection against such a misappropriation." We decline to adopt the reasoning set forth in *Griego* and note that a federal court decision interpreting state law is not binding on this Court. *Blyth v. Marcus*, 335 S.C. 363, 517 S.E.2d 433 (1999).

language of § 39–8–60(B) clearly indicates that trade secrets may be protected during discovery not only in misappropriation cases, but in "any civil action" where trade secrets are sought during discovery. *See Key Corp. Capital, Inc. v. County of Beaufort*, 373 S.C. 55, 59, 644 S.E.2d 675, 677 (2007) (noting that where a statute's language is plain, unambiguous, and conveys a clear meaning, the court has no right to impose another meaning).

This is not to say, however, that the "substantial need" language of the Trade Secrets Act is the sole relevant inquiry in determining the standard governing trade secret information. As Respondent points out, the South Carolina Rules of Civil Procedure also provide for the protection of trade secret information when such information is sought during discovery. Specifically, Rule 26(c), SCRCP, allows for protective orders under certain circumstances as follows:

> Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden by expense, including one or more of the following: ... (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way.

In determining whether trade secret information is subject to a protective order under Rule 26(c)(7), federal and state courts typically apply a balancing test that incorporates a "relevant and necessary" standard for the party seeking to discover the trade secret information.[10] *See generally* 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2043 (2d ed.1994) (hereinafter "Wright & Miller"); James J. Watson, Annotation, *Discovery of Trade Secret in State Court Action*, 75 A.L.R.4th 1009, 1028–30 (1990). The test is a three-part inquiry:

---

10. The language of Rule 26(c), SCRCP, mirrors that of federal Rule 26(c). Because there is no South Carolina precedent construing this rule, federal interpretation of Rule 26(c) is persuasive authority. *See State v. Colf*, 332 S.C. 313, 317, 504 S.E.2d 360, 361 (Ct.App.1998).

1. The party opposing discovery must show that the information sought is a trade secret and that disclosure would be harmful.
2. If trade secret status is established, the burden shifts to the party seeking discovery to show that the information is relevant and necessary to bring the matter to trial.
3. If both parties satisfy their burden, the court must weigh the potential harm of disclosure against the need for the information in reaching a decision.

*See also Mayberry,* 878 N.E.2d at 193; *Coca–Cola Bottling Co. of Shreveport, Inc. v. Coca–Cola Co.,* 107 F.R.D. 288, 292–93 (D.Del.1985).[11]

■ We disagree with Respondent's argument that our determination that the Trade Secrets Act applies to any civil action impermissibly supplants a rule of civil procedure. *See Baggerly v. CSX Transp., Inc.,* 370 S.C. 362, 635 S.E.2d 97 (2006) (rejecting an interpretation of a statute which would have contravened a rule of evidence). Unlike the statute at issue in *Baggerly,* § 39–8–60 does not improperly limit the operation of Rule 26, but rather is consistent with Rule 26 in that both provide for reasonable restrictions on the discovery of trade secrets. The Trade Secrets Act therefore does not supplant, but rather complements, Rule 26(c), SCRCP. *Cf. Mayberry,* 878 N.E.2d at 194 (finding that the application of Rule 26 to trade secrets "should be informed by Indiana's enactment of the Uniform Trade Secrets Act").

■ To this end, we hold that the balancing test associated with the discovery of trade secret information under Rule 26(c), SCRCP, governs the discovery of trade secret information in this matter. Regarding the requirement that the trade secret information must be "relevant," we hold that the information must be relevant not only to the general subject matter of the litigation, but also relevant specifically to the issues involved in the litigation. *See Duplan Corp. v. Deering*

---

11. Likewise, in jurisdictions where trade secrets are protected by a codified evidentiary privilege, the courts apply a similar balancing test. *See, e.g., In re Cont'l Gen. Tire, Inc.,* 979 S.W.2d 609 (Tex.1998); *Bridgestone/Firestone, Inc. v. Superior Court,* 7 Cal.App.4th 1384, 9 Cal.Rptr.2d 709 (1992).

476

*Milliken, Inc.,* 397 F.Supp. 1146, 1185 (D.S.C.1974). For the trade secret information to be deemed "necessary," we hold that the party seeking the information "cannot merely assert unfairness but must demonstrate with specificity exactly how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat." *In re Bridgestone/Firestone, Inc.,* 106 S.W.3d 730, 733 (Tex.2003); *accord Bridgestone/Firestone, Inc. v. Superior Court,* 7 Cal.App.4th 1384, 9 Cal.Rptr.2d 709, 713 (1992) (holding that a party seeking discovery must make a "particularized showing" that "the information sought is essential to a fair resolution of the lawsuit"). "Implicit in this is the notion that suitable substitutes must be completely lacking." *Mayberry,* 878 N.E.2d at 196. In other words, the trial court must evaluate whether there are reasonable alternatives available to the party seeking the discovery of the information, and ultimately, the trial court must require the discovery of a trade secret only when "the issues cannot be fairly adjudicated unless the information is available." Wright & Miller, § 2043.

From here, we turn to an analysis of the second issue on appeal in order to determine whether Respondent meets the "relevant and necessary" standard of proof for discovery of a trade secret.

## II. Application of the standard to Respondent's request for Bridgestone's skim stock formula

 Bridgestone argues that the trial court erred in finding that discovery of the skim stock formula was necessary to Respondent's case. Specifically, Bridgestone contends that: (1) the expert testimony does not establish that if the experts were provided the skim stock formula and related manufacturing information, they would necessarily be able to opine on a defect; and (2) other methods, such as testing the tire itself, are available to Respondent. We agree.

In our view, Respondent's experts' reasons for opining that the formula was necessary for their analyses do not rise to the level of specificity required for discovery of trade secrets. For example, expert Smythe did not elaborate on why it was "absolutely necessary" that he know the skim stock formula in order to render his expert opinion in the matter. Further-

more, although expert Ochs concluded in his affidavit that it was necessary to compare the failed tire with its initial physical properties because the tire's failure involved a separation of the tread belt, Ochs never explained how the occurrence of a tread belt separation should result in the automatic conclusion that the belt separation was related to the initial physical properties of the tire requiring disclosure of the skim stock formula. Given Queiser's and Duddey's testimony on the many potential causes of tread belt separation related to the usage of the tire rather than its initial physical properties, we find that Ochs's testimony lacks the precision required for Respondent to show that disclosure of Bridgestone's skim stock formula is necessary to this case. *See also Bridgestone/Firestone, Inc. v. Superior Court,* 9 Cal.Rptr.2d at 716 (finding that the tire expert did not "describe with any precision how or why the formulas were a predicate to his ability to reach conclusions in the case").

Expert Duddey's reasoning for acquiring the formula was similarly vague. In his affidavit, Duddey initially attributed the apparent surface cracking on the subject tire to either "fatigue or premature rubber aging," and the degree of hardness in the skim stock to "either the initial physical properties of the rubber compound or premature aging." When later asked at deposition to elaborate on the need for the skim stock formula, Duddey responded that "as a starter you need to know what the properties were as the tire was designed and manufactured and then you need to try to make some judgment as to if it's significantly different than when it was manufactured, how it got to that point." Duddey provided no indication in his response at deposition that he had examined and subsequently discarded the alternative theories propounded in his affidavit for the tire's failure. For this reason, we find that this testimony fails to adequately articulate how disclosure of the skim stock formula is critical to the analysis in this case.

We find also find no evidence that the skim stock formula is essential to a defect inquiry. Bridgestone's expert Queiser clearly indicated that because a tire is a complex object made up of many compounds, it would be inaccurate to gauge the performance of a particular tire by focusing on one isolated component or compound. Queiser also noted how properties

of the skim rubber compounds change as the tire ages. Respondent's experts, however, focused solely on the tire's initial properties without addressing Queiser's assertions regarding the interaction of compounds in the tire during the curing process and throughout the tire's lifetime. In this way, we find Respondent's experts failed to provide a sufficiently complete argument as to why the skim stock formula was necessary to their analyses of this case.

Furthermore, the experts' testimony provides no detailed indication as to how the case is incapable of being fairly adjudicated without the trade secret information. *See In re Bridgestone/Firestone, Inc.*, 106 S.W.3d at 733 (holding that the party seeking trade secret information cannot simply claim unfairness but must show "with specificity how the lack of the information will impair the presentation of the case on the merits to the point that an unjust result is a real, rather than a merely possible, threat"). While we recognize the logic in Respondent's theory that in order to prove a tire design or manufacturing defect, it would be useful to have knowledge of the original recipe and whatever manufacturing deviations were made from that recipe, we reiterate that the standard for discovery of trade secret information is "necessary," not "useful." *See Bridgestone/Firestone, Inc. v. Superior Court*, 9 Cal.Rptr.2d at 715 (finding that "it is not enough that a trade secret might be useful" to the party seeking discovery).

Additionally, we find that the trial court failed to analyze the availability of reasonable alternatives to the discovery of the trade secret. Specifically, a chemical analysis necessitating the discovery of Bridgestone's skim stock formula is not the sole, or even the best, way to test for defects. We find an October 2001 report issued by the National Highway Traffic Safety Administration (NHTSA) particularly instructive to the Court in this regard.[12] The stated purpose of the federal investigation documented in this report was to determine whether Firestone's August 2000 recall of Wilderness AT tires was adequate in scope. The report focused on non-

---

12. *See* U.S. Dep't of Trans., NHTSA, Office of Defects Investigation, *Engineering Analysis Report and Initial Decision Regarding EA00–023 Firestone Wilderness AT Tires* (October 2001) (hereinafter "NHTSA Report").

recalled tires that were manufactured primarily as original equipment for Ford Explorers, yet were similar to the tires recalled by Firestone in 2000. The study used peer tires, mostly Goodyear Wrangler tires, in order to compare performance results to the Wilderness AT tires being evaluated.

The methods of the federal recall investigation, employed on both Firestone tires and the peer tires, included "thorough analyses of available data regarding the performance of tires in the field; shearography analysis to evaluate crack initiation and growth patterns and their severity in tires obtained from areas of the country where most of the failures have occurred; and observations, physical measurements, and chemical analyses." NHTSA Report at iii. Additionally, the NHTSA conducted belt peel adhesion testing, a physical test on one-inch wide samples of tire tread which are essentially pulled by a tensile test machine "to measure the force required to 'peel' the two belts apart." *Id.* The report explained the purpose of this test as follows:

> [T]he properties of the belt wedge and skim rubber compounds change as the tire ages. These changes reduce the compounds' resistance to fatigue crack growth and catastrophic failure. One measure of the degradation of the belt rubber is the peel adhesion test. This test is most directly related to the belt rubber's resistance to a final, catastrophic belt-leaving-belt failure.

*Id.* The report specifically noted there was "no evidence of a belt wire-to-rubber adhesion issue." *Id.* at 23 n. 38.

The NHTSA concluded that a safety-related defect existed in Firestone Wilderness AT P235/75R15 and P255/75R16 tires manufactured prior to May 1998 at specified manufacturing facilities. One of the primary findings was that the design of the shoulder pocket of the tires could "cause high stresses at the belt edge and lead to a narrowing of the wedge gauge at the pocket," indicated by "a series of weak spots around the tire's circumference, leading to the initiation and growth of cracks" in the tires. *Id.* at 30.

We find it significant that the NHTSA, without focusing on the skim stock formula, conducted physical testing of the tires and ultimately arrived at a scientifically-supported conclusion that there was a design defect which caused belt separation.

This reliance on a structural analysis to determine defect, rather than a chemical analysis, provides tangible proof that other adequate means of testing for defects are available to Respondent and that therefore, Respondent's case will not be substantially impaired if he is denied access to the trade secret information. We note that other jurisdictions have similarly recognized that physically testing the tire itself for defects, including testing at a molecular level if necessary, may be a suitable substitute for testing based on the skim stock formula. *See Mayberry*, 878 N.E.2d at 196 (noting that testimony revealed that an inspection of the failed tire appears to be "more than an adequate substitute for examining the skim stock formula"); *In re Bridgestone/Firestone, Inc.*, 106 S.W.3d at 733 (finding that because a tire's physical properties can be tested without knowing the recipe for the skim stock compound, tests on a finished tire are "more probative of defect than its skim stock formula would be").

Further, the discovery already available to Respondent for analysis of the alleged defect includes information about development, design review, and testing of tires manufactured with the same specifications as the tire in this case. Bridgestone has also produced or agreed to produce analysis reports of inner liner problems with similar tires, reports from cut tire analysis done at the Hofu plant, and records and depositions from similar cases involving Bridgestone tires. The variety of information these documents encompass provides Respondent with "suitable substitutes" for analysis of the skim stock formula itself. *Mayberry*, 878 N.E.2d at 196. Thus, particularly in light of the discovery obtainable in this case, Respondent has not shown that the case is incapable of being fairly adjudicated without the trade secret information.

For these reasons, we hold that under the proper standard governing the discovery of trade secrets, knowledge of Bridgestone's skim stock formula is not "necessary" in order for Respondent to litigate the instant product liability action.[13] Accordingly, we hold that the trial court erred in finding that

_____

13. Contrary to the dissent's assertion, we do not reverse the trial court's order compelling discovery based on our view of the experts' testimonies. Rather, we reverse because Respondent failed as a matter of law to meet the applicable standard governing the discovery of trade secrets.

Respondent was entitled to discovery of Bridgestone's trade secret information.

■ We note that Bridgestone should not use our holding in this matter at trial to suggest weaknesses in Respondent's case due to his experts' ignorance about the formula. *See In re Bridgestone/Firestone, Inc.*, 106 S.W.3d at 734 (recognizing that it would be unfair for the manufacturer to argue the plaintiff's case was impaired due to lack of evidence that the manufacturer withheld); *Bridgestone/Firestone, Inc. v. Superior Court*, 9 Cal.Rptr.2d at 716 n. 8 (noting that it would be unfair for the manufacturer to challenge an expert at trial about his knowledge of the skim stock formula). Indeed, if at any time during the litigation, Respondent can satisfy his burden of showing necessity, this matter could be revisited. *See In re Bridgestone/Firestone, Inc.*, 106 S.W.3d at 734 (finding that while the mere possibility of unfairness is not enough to warrant disclosure of the information, this issue can be addressed should it materialize).

## CONCLUSION

For the foregoing reasons, we hold that Respondent failed meet the standard for the discovery of Bridgestone's trade secret information, and therefore, we reverse the decision of the trial court compelling the disclosure of Bridgestone's trade secret.

BEATTY, KITTREDGE, JJ., and Acting Justice JAMES E. MOORE, concur. PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES:

I respectfully dissent, and would affirm the circuit court's order compelling petitioner to disclose the skim stock formula. Since this order is before us on a common law writ of certiorari, we may reverse the trial court's decision only if it is affected by an error of law. *Berry v. Spigner*, 226 S.C. 183, 84 S.E.2d 381 (1954). We cannot consider the facts, "except to ascertain whether the order is wholly unsupported by the evidence." *Id.* Since I find evidence in the record, particularly

the affidavit of Dr. Duddey, which supports the circuit court's order, I would affirm.

In my opinion, the majority reverses not because there is no evidence, nor because the circuit court committed an error of law, but because, in the majority's view, the petitioners' experts were more persuasive than those of respondent. For example, the majority states respondent's experts did not address Queiser's assertion that a tire's performance is not dependent on its initial composition. Dr. Duddey, however, acknowledged that post-manufacturing factors could explain the tire's failure, but also maintained that he needed the formula in order to determine whether a design defect, perhaps in the antidegradant package component of the formula, contributed to its failure. In my view, whether this was sufficiently specific is a judgment call for the trial judge.

Moreover, the majority opines that "a chemical analysis necessitating the discovery of Bridgestone's skim stock formula is not the sole, or even the best, means to test for defect" and holds there is "no evidence that the skim stock formula is essential to a defect inquiry." It is not respondent's burden under either the Trade Secrets Act or Rule 26(c)(7), SCRCP to demonstrate that knowledge of the trade secret is the "best" or "sole" way for it to proceed, nor that it is "essential," but rather that it has a "substantial need"[14] for this "relevant and necessary"[15] information. Applying our limited scope of review on certiorari[16] to the order before us, I would hold there is evidence to support the trial judge's findings that respondent has met his burden.

I would affirm.

---

14. S.C.Code Ann. § 39–8–60(B).

15. Rule 26(c)(7), SCRCP.

16. *Compare Bridgestone Americas Holding, Inc. v. Mayberry,* 878 N.E.2d 189 (Ind.2007); *In re Bridgestone/Firestone, Inc.,* 106 S.W.3d 730 (Tex. 2003) *citing In re Continental General Tire, Inc.,* 979 S.W.2d 609, (Tex.1998), relied upon by the majority, both of which came before the reviewing courts under the more liberal "abuse of discretion" standard of review.